## CONSOLIDATED WATER POWER & PAPER CO. v. BOWLES, Price Adm'r.

### No. 126.

United States Emergency Court of Appeals.
Heard at Washington Sept. 22, 1944.

Decided Dec. 6, 1944.

J. Verser Conner, of Louisville, Ky. (Charles S. Kelly, of Chicago, Ill., Hubachek & Kelly and John D. Hastings, both of Chicago, Ill., and Renah F. Camalier, of Washington, D. C., on the brief), for complainant.

Nathaniel L. Nathanson, Associate Gen. Counsel, of Washington, D. C. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Chief, Court Review Price Branch, Ernest R. Mortenson, Louis L. Rochmes, and Josephine H. Klein, Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

LAWS, Judge.

This suit involves Maximum Price Regulation No. 451,[1] which was issued August 19, 1943, to replace the provisions of the General Maximum Price Regulation so far as it established ceiling prices to govern sales of book paper. In the Regulation is an Appendix A, paragraph (a) of which provides dollars-and-cents maximum prices for 14 specified grades of book paper. Names of brands and their manufacturers are set forth under each of the specified grades as examples of the brands which are "to be considered to be that grade." Provision is made for the listing of a brand which is not listed in paragraph (a) as an example of a specified grade, "if it has heretofore been sold and distributed by the manufacturer and recognized and

---

[1] 8 F.R. 11529.

accepted in the trade as that grade." By paragraph (b) of Appendix A, a freeze method of price control is applied to book papers unlisted in paragraph (a).

As the Regulation was originally issued, a question arose as to the basis for classifying the brands listed in Appendix A. From the introductory paragraphs of Appendix A,[2] it appeared that the classification might be dependent solely on whether the manufacturer and the trade had customarily dealt with a particular brand as one of the specified grades. The Administrator claimed this to be the proper interpretation. On the other hand, by construing the term "grade" in Appendix A as that term was defined in Section 14(a) (9) of the Regulation,[3] it appeared possible to interpret the classification as depending upon the existence of quality equal to one of the specified grades. Complainant adopted the latter interpretation. Two of its brands, known as "Production Gloss Coated" and "Modern Gloss Coated", were not listed as examples of any grade in Appendix A, but were considered by complainant to be equal in quality, respectively, to Nos. 4 and 5 Glossy Coated White grades, two of the 14 grades specified in Appendix A. Therefore, complainant notified the Office of Price Administration that its Production Gloss Coated was a No. 4 Glossy Coated White grade and that its Modern Gloss Coated was a No. 5 Glossy Coated White grade and sought to have these brands listed in paragraph (a) of Appendix A. Although the Administrator conceded that complainant's two brands

were equal in quality to those accepted in the trade as the specified grades, he refused to list them in paragraph (a) of Appendix A as examples of the grades.

Complainant filed before the Administrator a formal protest by which it objected to the Administrator's refusal to list its brands and took the position that if the Administrator's interpretation as to the requirements for such listing was found to be correct, the Regulation was invalid. Complainant also objected to the manner of price fixing established by paragraph (b) of Appendix A, by which its products were governed. The Administrator denied the protest.

Complainant then brought separate suits to obtain the relief to which it claimed to be entitled. It applied to the District Court of the United States for the District of Columbia for a declaratory judgment that its brands were Nos. 4 and 5 Glossy Coated White grades, within the meaning of the Regulation, and that they were entitled to classification within paragraph (a) of Appendix A. Shortly after filing suit in the District Court and before its decision, complainant filed the suit now before us, challenging the Administrator's interpretation of the Regulation and attacking its validity as so interpreted.

After both suits were filed, the Administrator, recognizing that the language of the Regulation was open to misconstruction, adopted Amendment No. 2 of the Regulation by which he undertook to define more expressly the term "grade" as used in Appendix A.[4] The Amendment was de-

---

[2] "The maximum base price for spot sales of book paper by a manufacturer to a merchant shall be the price set forth in paragraph (a) of this Appendix A in all cases where the book paper being priced falls under one of the grades listed in that paragraph (a). The maximum base price for spot sales by a manufacturer to a merchant of book paper which does not fall under one of those grades is to be determined under paragraph (b) of this Appendix A. * * *

"In determining whether a particular book paper falls under one of the grades listed in paragraph (a) the manufacturer is to check the examples of each grade enumerated after the list of maximum prices. If the book paper in question is listed by brand name in paragraph (a) as an example of a particular grade, it is to be considered to be that grade. A book paper shall be considered to be a particular listed grade even though it is not expressly in-

cluded in paragraph (a) as an example of that grade, if it has heretofore been sold and distributed by the manufacturer and recognized and accepted in the trade as that grade; a manufacturer who identifies a book paper with one of the listed grades in this manner shall so advise the Office of Price Administration * * *."

[3] § 14(a) (9) " 'Grade' means one particular quality within a kind of book paper, such grade having the essential properties peculiar to such kind of paper and common to all grades within such kind, but distinguished from other such grades by a difference in the degree to which one or several of those common properties are emphasized. * * *"

[4] 9 F.R. 3030. As amended, § 14 (a) (9) reads as follows:

" 'Grade,' when used in paragraph (a) of Appendix A, refers to any group of brands of book paper which prior to the issuance of the regulation were recognized and ac-

signed, according to the Administrator, to expand the definition of "grade" in Section 14(a) (9) so as to conform to his position that no quality determination by him should be read into the classification made in Appendix A, since it was based solely on a determination of whether each listed brand had been sold and distributed by the manufacturer and recognized and accepted in the trade as the grade under which it was listed. The Administrator maintained that this had been the correct interpretation of the Regulation from the outset, so that the amendment effected no change in substance.

Complainant's suit for declaratory judgment in the District Court of the United States for the District of Columbia was dismissed, the court finding the greater weight of the evidence to be that complainant's book papers were not "prior to the issuance of the regulation recognized and accepted in the trade under the designation of No. 4 and No. 5 Glossy Coated White book papers," and finding as a matter of law that any claim as to the validity of the Regulation based upon exclusion of its papers from the listing of those of equal quality in Appendix A must be passed upon by this Court.

 As previously noted, by the suit pending before us, complainant takes the position that the Administrator has misinterpreted the Regulation and alleges that if this interpretation is adopted by the Court the Regulation is invalid. So far as the question of interpretation is concerned, complainant contends that Amendment No. 2 did not eliminate the right to have a brand listed in paragraph (a) of Appendix A if the brand had qualities equal to those of a grade specified in such paragraph. As we have said, the language of the Regulation, as it appeared before adoption of Amendment No. 2, was ambiguous as to the basis upon which brands were listed in

Appendix A. In any case of ambiguity in a regulation established by an administrative officer, his interpretation is entitled to great weight.[5] Where reasonable, it well may be controlling. We are of opinion that in the case before us, the Administrator's interpretation was reasonable; while judgment as to quality inheres in any classification according to grade, yet in this case it appears the Administrator sought to avoid the burden of judging quality of the numerous brands of book paper and therefore planned to employ a test of trade acceptance and recognition as the sole basis for listing any brand in the Regulation. When first called upon to interpret the meaning of the Regulation, the Administrator expressed the view that it did not permit listing in Appendix A upon proof alone of quality equal to that of the brands so listed. He has consistently held to this interpretation. In addition to these circumstances, it appears that the Administrator amended the Regulation with a view to removing all doubt upon the point and that his plan now is made clear beyond serious doubt by the provisions of Amendment No. 2. For the reasons stated, it is our view that we should accept the Administrator's interpretation of the original Regulation and proceed to pass upon the question of its validity as so interpreted.

 In considering the validity of a price regulation, this Court generally must be guided, on the one hand, by a consideration of its necessity to the establishment of effective price control and, on the other hand, by a consideration of its effect upon industry. So far as the latter consideration is concerned, the Act provides that a regulation shall be "generally fair and equitable" Sec. 2(a), 50 U.S.C.A.Appendix, § 902(a), and that it shall be set aside when found by this Court to be arbitrary or capricious. Sec. 204(b), 50 U.S.C.A. Appendix, § 924(b). In this case, com-

---

cepted in the trade under the designation of the particular *grade* name. While each 'grade' in this sense embraces book paper considered in the trade as having various common characteristics or as being of equivalent value, this regulation does not attempt to determine whether a particular brand of book paper has been properly grouped by the trade on the basis of such characteristics or value, but merely whether or not the brand involved was in fact treated by buyers and sellers of book paper as falling within the group denoted by the particular grade name. When used with-

out reference to any group of brands, the term 'grade' means one particular quality within a kind of book paper, such grade having the essential properties peculiar to such kind of paper and common to all grades within such kind, but distinguished from other such grades by a difference in the degree to which one or several of those common properties are emphasized. * * * " The language added by the Amendment appears in italics.

[5] Walling v. Cohen, 1944, 3 Cir., 140 F. 2d 453, 455.

plainant maintains unfairness and unreasonableness result from the Regulation as interpreted by the Administrator because it draws a distinction between complainant's products and others of equal quality and thereby imposes upon complainant a competitive handicap which it had not previously suffered. It is generally regarded as essential to fair treatment that all persons who are similarly situated be dealt with upon an equal basis; "that no greater burdens should be laid upon one than are laid upon others in the same calling and condition." [6] We have recently applied this principle in a case where we found a price regulation invalid because it subjected the complainant to a competitive handicap "not characteristic of the industry prior to price control and which, so far as this record discloses, is wholly unnecessary for the effectuation of the purposes of the Act." [7]

A study of the Regulation here under attack inevitably leads to the conclusion that book papers are grouped in Appendix A according to their quality. This is the necessary significance of the listings in the Appendix, because the categories mentioned are given names that the trade has customarily used to describe different qualities. The conclusion results also from the fact that the classification is made on the basis of "grade", a term which is universally understood as referring to quality and which is defined in the Regulation itself as "a quality within a kind of book paper." The Administrator himself has conceded that the trade recognition which he employed as the test for listing a brand was based upon the judgment of the trade as to qualities of the brand.

■ The Administrator classified most of the brands of book paper under 14 specified grade names used in the trade and provided that others might be so classified when it was shown they were actually recognized and accepted in the trade as one of those grades. From this classification the inference is inescapable either that omitted papers are of a different quality or that they have not been passed upon in the trade as being of the same quality. In point of fact, neither inference is necessarily true, and in any case where neither is true, the omitted papers obviously will suffer a competitive handicap not experienced be-

fore the Regulation was issued. The case of complainant illustrates such a situation. For many years it spent large sums of money in developing its manufacturing process and advertising its products. Apparently, for a time, because of a difference in its method of manufacture, there was some reluctance in the trade to accept its products as equal to others. But at length complainant succeeded in having two of its products recognized and accepted in the trade as having the same qualities as Nos. 4 and 5 Glossy Coated White grades. The evidence in the record as to this recognition and acceptance is impressive. In the trade complainant's Production Gloss Coated and its Modern Gloss Coated book papers were commonly associated in the same quality class with Nos. 4 and 5 Glossy Coated White grades. Yet when the Administrator established price control by means of grade classifications in his Regulation, complainant's two products were separated from Nos. 4 and 5 Glossy Coated White grades and other grades recognized and accepted in the trade as having certain qualities. In the grade classifications, 277 brands were listed by their names and the names of their manufacturers; each was provided with a dollars-and-cents ceiling. Complainant's two brands, though of equal quality to some of those listed, were deprived of their customary association in the trade with the listed brands. They were relegated to a type of control which provided no listing by name or grade and no dollars-and-cents ceiling. The Regulation in this form resulted in discrimination between equals. If it be granted complainant's products were not stigmatized as inferior, which is questionable, at least complainant was prejudiced by being put in a position where it had the burden of convincing purchasers of book paper that the trade had recognized its products as being of equal grade with Nos. 4 and 5 Glossy Coated White grades.

Beyond question the Administrator had no such purpose, and when the question of discrimination was suggested, he attempted to correct any such impression. By Amendment No. 2, the Administrator stated that "this regulation does not attempt to determine whether a particular brand of book paper has been properly grouped by the trade on the basis of such characteristics or value, but merely wheth-

---

6 Barbier v. Connolly, 1885, 113 U.S. 27, 5 S.Ct. 357, 359, 28 L.Ed. 923.

7 Flett v. Bowles, 1944, Em.App., 142 F.2d 559, 565.

er or not the brand involved was in fact treated by buyers and sellers of book paper as falling within the group denoted by the particular grade name." Other statements were made to the same general effect. But notwithstanding his efforts to prevent unfair discrimination, we are convinced he has not succeeded. Since as now amended the Regulation retains the original classifications according to grade, the inference continues that brands not listed either are not equal in quality to listed brands, or that if they are, they have not been so recognized by the trade. Such an inference is not dispelled by statements to the effect that the Regulation does not attempt to determine whether a brand of book paper has been properly grouped by the trade on the basis of characteristics or value. Rather the tendency of these statements is to emphasize the inference that complainant's products were considered by the trade to be different in quality from those listed.

We do not wish to be understood as intimating that the Administrator does not have the right, as a general rule, to base maximum prices upon grade classifications of products and to depend upon trade recognition and acceptance in determining how to classify the products. If restricted to the use of grade classifications only when his own organization would be in a position to determine the grades, the burden might prove intolerable. It is conceivable that in some instances trade recognition and acceptance alone may prove to be an unfair basis for making classifications according to grade. The suggestion is made in this case that the practice of the book paper trade is so indefinite and inadequate in its method of recognition and acceptance by grade that it does not afford a reasonable basis for grade classification in a price regulation. Our examination of the record indicates this may be true. However, it is not necessary for us to decide this point for the reason that in this case, while the Regulation purported to give effect to trade classifications according to grade, the trade's recognition and acceptance of the quality of two of complainant's products were actually ignored. In the groups which were set up in the Regulation the Administrator listed 277 products recognized by the trade as having certain qualities, but omitted two products of complainant which the trade had also recognized as having those qualities.

These omissions might not have been fatal to the Regulation if provision had been made for the listing of omitted products which were shown to have acquired trade recognition and acceptance as to their qualities. However, the language of both the original and the amended Regulation failed to make such provision. The original Regulation provided in effect that a brand might be listed only if it had been recognized and accepted in the trade "as that grade." Amendment No. 2, in explaining the term "grade" as used in Appendix A states that it refers to any group of brands which were recognized and accepted in the trade "under the designation of the particular grade name." The Regulation thus requires that a brand must have been tagged by the trade as a particular grade before it is entitled to be listed under that grade. Since the trade did not apply the same tag to all products of equal grade or quality, this requirement does not in all cases reflect the actual trade recognition and acceptance as to the grades of various book papers.

We have given consideration to the question whether the form of the Regulation which we have found objectionable is necessary to the accomplishment of effective price control and have found nothing to suggest that it is. Therefore, we are of opinion that the Regulation in its present form should be set aside.

The views we have expressed do not require that the ceiling prices applicable to complainant's products shall be increased. Complainant urges that the pricing provisions of the Regulation are discriminatory; that between 1939, when inflationary influences began to cause price increases, and 1941, when price controls were applied, complainant raised its prices to a lesser degree than its competitors, with the result that prices were frozen by the General Maximum Price Regulation at levels which allowed complainant's competitors greater price increases over their 1939 levels than were allowed complainant. In the Statement of Considerations which accompanied Maximum Price Regulation No. 451, the Administrator stated that "the regulation effects no significant change in the level of maximum prices established for book paper by the General Maximum Price Regulation." Complainant has not challenged the accuracy of this statement. It therefore appears that its objections to the pricing features of Maximum Price

Regulation No. 451 essentially are based on the proposition that the Administrator is without authority to establish maximum prices by the freeze method applied by the General Maximum Price Regulation. We have approved the use of this method of control in connection with rents [8] and see no reason why it is not equally appropriate for controlling prices of commodities.[9] We conclude that complainant's objections to the pricing provisions of the Regulation are without merit.

Complainant has raised other objections to the validity of the Regulation which it appears unnecessary to discuss. If the Regulation is redrafted so as to eliminate the discriminatory features to which we have pointed, it is likely that complainant's remaining objections will be eliminated.

A judgment will be entered setting aside Maximum Price Regulation No. 451 insofar as it denies the same grade classification and form of price control to products recognized in the book paper trade as being of equal quality.

---

[8] Madison Park Corp. et al. v. Bowles, 1943, Em.App., 140 F.2d 316, 324, and cases there cited in footnote 8.

[9] See Philadelphia Coke Co. et al. v. Bowles, 1943, Em.App., 139 F.2d 349.