## CUDAHY BROS. CO. v. BOWLES, Price Administrator.

### No. 160.

United States Emergency Court of Appeals.
Heard at Milwaukee Jan. 20, 1945.

Filed April 11, 1945.

Van B. Wake, of Milwaukee, Wis. (J. D. Shaw, of Milwaukee, Wis., on the brief), for complainant.

Jacob D. Hyman, Chief, Court Review Price Branch, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Carl H. Fulda and John J. Downey, Jr., Attys., all of the Office of Price Adminis-tration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and LINDLEY and LAWS, Judges.

MARIS, Chief Judge.

The complainant operates a private stockyard and meat packing plant in the City of Cudahy, Milwaukee County, Wisconsin, where it receives, weighs and purchases live hogs for use in its packing operations. It is accordingly subject to Maximum Price Regulation No. 469—Live Hogs, issued September 11, 1943, and effective October 4, 1943.[1] Having filed two protests setting up objections to the regulation both of which were denied by the Price Administrator, the complainant has filed its complaint in this court in which it raises the same objections for our consideration. The objections are that the regulation is unlawfully discriminatory against the complainant, first, because it establishes a maximum price for live hogs at Chicago which is 10 cents per hundredweight higher than that established at Cudahy, and, second, because it prohibits the feeding or watering of hogs on the day of sale prior to weighing at private but not at public stockyards.

Considering the first objection we quote from the Administrator's statement of considerations involved in the issuance of the regulation as follows:

"The ceiling prices fixed by the accompanying regulation are specific dollar-and-cents prices. One set of prices is prescribed for terminal markets, another for interior markets, a third for buying stations. Prices also vary by zones. No seasonal price variation is compelled by the regulation, nor is any attempt made to price by grade.

"The form of the regulation and the price levels it establishes are designed to meet four principal objectives: (1) to maintain customary geographical price relationships; (2) to relate the hog price structure to the wholesale pork ceilings established ·by Revised Maximum Price Regulation No. 148, as amended; (3) to minimize the ceilings' impact upon normal distribution methods, recognizing that ceilings are such a radically new element in marketing that some disturbance is inevitable; and (4) to make the regulation comparatively simple and free of complications, recognizing that this aim prohibits undertaking the difficult task of integrating

detailed provisions designed to shelter special or relatively unusual ways of doing business." [2]

The regulation fixed a ceiling price of $14.75 per hundredweight for live hogs at the terminal market at Chicago with differentials from that price for the various other major terminal markets. These differentials the Administrator states were "closely related to the pattern of hog prices that prevailed in the past." [3] Included among them was the differential of 10 cents less per hundredweight for sales of live hogs at Cudahy.

The complainant asserts that the regulation is arbitrary and discriminatory because the differential in question does not in fact reflect an historical difference between the prices paid for live hogs at Chicago and Cudahy. We do not think that the complainant has established this basic support for its objection, however. It is asserted by the Administrator and not denied by the complainant that medium-weight hogs have always commanded a higher price than heavy-weight hogs. The evidence establishes that the average weight of the hogs slaughtered by the complainant at Cudahy is considerably below the average weight of the hogs slaughtered at Chicago. Accordingly it would appear to be necessary for the complainant, in order to prove its contention, to show that historically the prices realized for hogs at Cudahy were substantially the same as the prices realized at Chicago for hogs which came within the Cudahy weight ranges.

Price figures for live hogs at Cudahy and for corresponding weight ranges of live hogs at Chicago for the years 1939, 1940, 1941, 1942 and the first half of 1943 are in evidence. The comparability of these figures and the proper weight to be given to them has been much discussed in argument. We have carefully considered these figures in the light of the contentions made with respect to them. No useful purpose will be served by discussing those contentions in detail. It is enough to say that the figures in evidence may fairly be interpreted as furnishing sufficient support for the Administrator's finding that there was an historical differential in the prices of hogs of similar weights in favor of Chicago which closely approximated 10 cents.

The complainant contends, however, that it was wrong to confine the comparison of the Cudahy and Chicago live hog prices to comparable weight ranges because MPR 469 does not establish prices for different grades and classes of hogs. Since lighter-weight hogs do not command a premium under the regulation the complainant urges that it cannot rely upon continuing to secure any substantial numbers of such hogs. We do not think that this is ground for holding the disputed differential invalid. The regulation, as we have seen, was expressly designed to reflect normal price relationships between the different markets. This was clearly an appropriate basis upon which to establish the regulation. Consolidated Water Power & Paper Co. v. Bowles, Em.App., 1944, 146 F. 2d 492. The only price relationship between Chicago and Cudahy which is significant is the relationship between the prices paid for hogs of weight ranges which are dealt in at both places. We cannot hold that the Administrator was arbitrary or discriminatory in so framing the regulation as to preserve this existing relationship.

Moreover it must be remembered that the regulation deals not only with the Chicago and Cudahy markets but also with all the other live hog terminal markets throughout the country. Among these other terminal markets is the City of Milwaukee, for which the regulation likewise fixes a differential of 10 cents per hundredweight in favor of Chicago. Since Cudahy is adjacent to Milwaukee it is hard to see how a differential between the two could be justified. The complainant, however, has offered no evidence to indicate that the differential established by the regulation for Milwaukee is improper or that it is erroneous to maintain the same maximum prices at both Milwaukee and Cudahy. We conclude that the complainant's objection based upon the price differential between Cudahy and Chicago cannot be sustained.

Passing to the consideration of the complainant's second objection we turn again to the Administrator's statement of considerations involved in the issuance of the regulation. We quote his findings with respect to the fill practice as follows:

"The question of comparative fill practice at terminal markets is especially im-

[2] O. P. A. Service—3 Food, 47,336.     [3] O. P. A. Service—3 Food, 47,337.

portant. The regulation fixes the same ceiling price, per hundredweight, for the hog whether it be sold at the public yards or directly to a slaughterer in the municipality. In the latter type of sale, the farmer incurs few of the marketing costs incurred through sale at the yards. Yet the prohibition against filling at the slaughterhouse may permit him to net as much through selling a filled hog at the yards.

"The amount of filling before sale at slaughterhouses has always been much smaller than at public yards. In some cases, the farmer is permitted to water the hogs before they are weighed, while in a few exceptional instances he may feed and water them. Feeding and watering has usually been limited to hogs which have traveled long distances. In most instances the hogs are trucked only short distances to the slaughterhouse, are neither fed nor watered before weighing.

"The lack of uniformity in fill practice at slaughter plants and country points, and the general tendency at such markets to avoid any filling have dictated the abolition of fill before weighing at all points except public yards. The hidden price increases which would result from an attempt to perpetuate by general language abnormal instances where filling was customary, the inadequacy of enforcement techniques to prevent such hidden price increases, and the widespread maldistribution of hogs which such price increases would inevitably induce have made this abolition essential to price control.

"On the other hand, most public yards have customarily permitted filling before weighing. The difficulties of enforcing compliance with customary past practices are not so great, in the case of a public stockyard, as there are many buyers on the same market, each of whom is familiar with his competitor's customs."[4]

The complainant has offered no evidence to controvert the facts thus found and relied upon by the Administrator. Its contention is that it has made regular use of the fill practice in the past and that to prohibit the continuance of the practice at the complainant's private stockyard while permitting it at public stockyards is arbitrary and discriminatory. We do not agree that the regulation is arbitrary or discriminatory in its application to the complainant in this respect.

The complainant's evidence shows that not more than 17% of the total weight of live hogs purchased by it for slaughter in September, 1943 were fed and watered before weighing on the day of sale. This indicates that the practice was a comparatively minor one which the complainant is not entitled to maintain in face of the finding by the Administrator that its elimination is essential to price control. It is, of course, true that the seller of live hogs at a public stockyard may secure, by means of the fill practice, a higher price for his hogs than he could obtain at the complainant's private stockyard where filling is not permitted. But the evidence supports the Administrator's finding that this increased return is substantially offset by the marketing charges which are imposed upon the seller by the public stockyard. It will thus be seen that no substantial discrimination in fact results.

A judgment will be entered dismissing the complaint.