**BAYUK CIGARS, Inc., v. PORTER, Price Administrator.**

No. 267.

United States Emergency Court of Appeals.

Heard at New York City Jan. 18, 1946.

Decided March 20, 1946.

MAGRUDER, Judge, dissenting.

———◆———

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

Daniel Lowenthal, of Philadelphia, Pa. (A. Arthur Miller, of Philadelphia, Pa., on the brief), for complainant.

Betty L. Brown, Atty., Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Associate Gen. Counsel, and John O. Honnold, Jr., Chief, Court Review Price Branch, all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

McALLISTER, Judge.

This case involves the price regulation establishing maximum prices for tobacco used in the manufacture of cigars.

Maximum Price Regulation No. 494, issued November 13, 1943,[1] established maximum prices (in dollars and cents) for domestic cigar filler and binder tobacco of the 1943 crop.

Revised Maximum Price Regulation No. 494, issued December 16, 1944, and amended January 30, 1945,[2] established maximum prices for the same types of tobacco of the 1944 crop.

In Revised Maximum Price Regulation No. 494, the maximum price at which *green* tobacco may be sold by the growers was established by Section 3 thereof.

Section 4 of the Regulation established a formula for computing the maximum prices at which *packed* tobacco may be sold, by adding to the price of green tobacco, first, the actual packing costs, and, second, a mark-up of 18%.

Growers, therefore, may either sell their tobacco as green tobacco at the lower prices provided in Section 3 of the Regulation, or pack the tobacco themselves (or have it packed), and then sell at the greatly increased price which includes the price of the green tobacco, the packing costs, and the 18% mark-up.

As a result of the Regulation granting the mark-up of 18%, many of the growers who prior to the Regulation had sold their tobacco as green or unpacked, naturally proceeded to take advantage of the tendered mark-up and sold their tobacco packed, at the higher prices. The packing, in such a case, was usually done by an established packer, or by a cooperative association, which was organized after the Regulation was issued.

Complainant is, and has been for many years in the past, engaged in the business of purchasing and processing tobacco, and manufacturing, selling, and distributing

[1] 8 F.R. 15663.

[2] 9 F.R. 14725.

cigars. During the course of its existence, it has become the largest single buyer of Lancaster County, Pennsylvania, tobacco, having, in some years, purchased more than 50% of the entire crop for its needs. Formerly, complainant bought green tobacco from the growers, and has itself packed it according to its own methods. Under the Regulation, it is able to buy hardly any green tobacco, inasmuch as nearly all the growers, desirous of securing the additional 18% mark-up which is allowed for packed tobacco, arrange to have their product packed before selling it to complainant and other purchasers.

We are here particularly concerned with Section 2(a)(9) of Revised Maximum Price Regulation No. 494, as amended, which defines the class of persons who qualify as packers of tobacco and are, therefore, entitled to receive the maximum price established for sales of tobacco by packers.[3]

Under the foregoing section of the Regulation, as interpreted,[4] manufacturers cannot custom pack tobacco for growers and then pay to the grower the maximum price established for sales of tobacco by packers; and when a manufacturer or packer custom packs tobacco for a grower or leases to the grower premises or equipment for packing, he cannot pay to the grower more than the grower ceiling price.

It should here be observed that the above interpretation of the Regulation has been approved, and the Regulation as interpreted, enforced by the District Court for the Eastern District of Pennsylvania, in Bowles v. Bayuk Cigars, D.C., 1945, 59 F. Supp. 745. Complainant in the protest proceedings has assumed that such interpretation was proper, and, accordingly, for the purpose of this case, we shall do the same.

On February 4, 1945, complainant filed protest directed against the provisions of Section 2(a) (9) of Revised Maximum Price Regulation No. 494, as interpreted by the Office of Price Administration on the ground that: (1) Section 2(a) (9) of the Regulation as interpreted was in contravention of Section 2(h) of the Emergency Price Control Act of 1942, as amended,[5] because it operated so as to compel changes in business practices and means of distribution established in the

---

[3] Section 2(a) (9), as it appeared on the date on which the present proceedings were commenced (subsequent changes not being relevant to this proceeding) read as follows:

"'Packer' means a person who with respect to the tobacco being priced sorts, grades, sizes, sweats and bundles, bales or cases the tobacco in accordance with established trade custom as to the type and grade of tobacco involved ready for use by a manufacturer of tobacco products. A manufacturer shall be deemed a packer of any tobacco with respect to which he performs or causes to be performed for his account these functions. A grower shall not be deemed a packer solely because he sorts, bundles or cases tobacco after curing and prior to its first weighing after delivery."

[4] The official interpretation of Section 2(a)(9) appeared in the following statement issued by the Office of Price Administration on January 8, 1945:

"Manufacturers and packers of cigar filler and binder tobacco who pack the tobacco for the growers account and then buy it from the grower at the ceiling price for packed tobacco are violating ceiling prices, the Office of Price Administration said today. Growers who take part in such selling arrangements are also in violation, * * *.

"When a manufacturer or packer custom packs tobacco for a grower, he cannot pay more than the grower ceiling price for the tobacco. This is also true when premises or equipment are leased to the grower for packing the tobacco.

"Efforts are being made, OPA said, by some growers, packers and manufacturers to evade the grower ceiling prices by agreements with respect to packing.

"Under these agreements, some manufacturers and packers will pack the grower's tobacco with the intention of buying it from the grower at the ceiling price for packed tobacco, OPA explained.

"There have also been cases when the manufacturer or packer agreed in advance to lease premises and equipment to the grower for packing fillers and binders with the understanding they would later pay the grower the ceiling price for packed tobacco."

[5] Section 2(h) of the Act, as amended, 50 U.S.C.A.Appendix, § 902(h), provides:

"The powers granted in this section shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, or changes in established rental practices, except where such action is affirmatively found by the Administrator to be necessary to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act.'"

area in question in connection with the marketing of the tobacco crop; (2) that it created classifications which were not based on any sound or established business or economic reasons; (3) that it resulted in discrimination against the tobacco growers in Lancaster County, and against purchasers of the tobacco, including, particularly, complainant; (4) that it operated to prevent the complainant from using its packing facilities and operating its business in accordance with the practice that complainant had followed for many years and which is necessary for the preservation of its business.

The protest was referred to a Board of Review which found against complainant's contentions and recommended denial of its protest. The Administrator followed the recommendations and entered an order denying protest on the ground that: (1) Complainant failed to show that Section 2(a) (9) of the Regulation as interpreted contravened Section 2(h) of the Act, because the section did not operate to compel changes in business practices; (2) that even though the section would compel changes in business practices, the Administrator had found such Regulation necessary to prevent evasion; (3) that complainant had failed to show that the Regulation discriminated against it. On October 25, 1945, complaint was filed in this court.

In our disposition of the case, it is unnecessary to determine many of the issues submitted, but a review of the contentions advanced thereunder by the parties will serve to illuminate the background and bring into focus the ultimate ground of decision.

In support of its claim that the Regulation as interpreted operates to compel changes in business practices in contravention of Section 2(h) of the Price Control Act, complainant points to the fact that for many years it has been the largest single purchaser of Lancaster County tobacco; that normally, the greatest portion of such tobacco crop was sold by growers as green tobacco; and that since the Regulation permits the growers to have their tobacco packed and then sold as packed tobacco, with the cost of packing tacked on to the price of green tobacco and the addition of a mark-up of 18%, the result is that, with the inducement of this allowance of a net price of 18% more for packed tobacco than for green tobacco, the growers would not and do not follow the normal marketing process of selling the tobacco in green form. Complainant submits that, as a consequence of the Regulation as interpreted, the growers generally were compelled to change their marketing methods and sell their tobacco as packed, rather than as green tobacco, in order to receive the highest price for their crops. The result, it is claimed, was that complainant was able to purchase only a fraction of its requirements of the 1944 tobacco crop.

To the foregoing, the Administrator replies that complainant had never, in the past, purchased any tobacco in packed form (which it had previously packed for the growers), and that there was no proof or claim that such a practice had been followed by other members of the industry. It is, therefore, argued that the purchase of tobacco which had been packed by the buyer for the seller is not a practice established in the industry within the scope of Section 2(h) of the Act, citing Safeway Stores, Inc. v. Bowles, Em.App., 1945, 145 F.2d 836; Lehigh Valley Cooperative v. Bowles, Em.App., 1945, 148 F.2d 828. Moreover, it is asserted that even though the Regulation as interpreted might compel changes in business practices, the Administrator found in this case that the prohibition in question—against the manufacturers' packing the tobacco for the growers and then paying the growers the price for packed tobacco—is necessary to prevent circumvention and evasion of the Regulation. For it is said that the admitted design of the custom packing arrangement was to give the growers returns for unpacked tobacco in excess of the maximum prices prescribed by the Regulation, and as stated by counsel for the Administrator: "It is evident that if buyers were permitted to pay the higher price for tobacco which they had packed for the seller, the ceiling price for unpacked tobacco would be rendered meaningless." Consequently, it is declared, that, under Section 2(h) of the Act, the Administrator was justified in his interpretation of the Regulation, even though the result might be to compel changes in business practices, since the statute encompassed such a situation, in cases where it was found necessary to prevent circumvention or evasion of any regulation, order, or requirement under the Act. Furthermore, the Administrator calls attention to the fact that, in any event, Section 2(h) applies only to regu-

506

latory provisions which *compel* changes in business practices, and that, here, neither the growers were compelled by the Regulation to pack their tobacco before sale, nor was complainant—and the cigar industry—compelled to change its established practices; and it is submitted that a desire on the part of growers to secure an economic advantage does not constitute compulsion under the statute, and that there was no compulsion upon complainant to purchase packed tobacco, simply because it was unable to purchase green tobacco.

Complainant insists that it cannot use tobacco packed by others because it requires a special secret process of packing and fermentation in the manufacture of its unique type of cigars; that, accordingly, it is wholly dependent for its tobacco supplies upon the purchase of unpacked tobacco; that, because of the operation of the Regulation, it is unable to purchase unpacked tobacco, inasmuch as the growers will sell only packed tobacco because they receive a greatly increased net sale price as compared to the price for green tobacco; that complainant is prevented by the Regulation from packing the tobacco by its secret process for the grower and then purchasing it as packed tobacco, because the Regulation forbids payment of the packed price to a grower when a manufacturer has done the packing; and that, since, under the Regulation as interpreted, complainant can neither buy green tobacco and pack it for its own uses, nor pack it for growers, for its own uses, and pay the packed price which the growers demand, the result of the operation of the Regulation is to deprive it of its normal share of the Lancaster County tobacco and prevent it from manufacturing its special kind of cigars.

To all of these claims the Administrator replies that complainant's own evidence shows that independent packers with whom it has been doing business for many years can pack tobacco in accordance with its requirements and that furthermore, there was no showing of the extent, if any, to which complainant's production of cigars has been curtailed through the asserted inability to obtain unpacked tobacco from the growers. With respect to the claimed admissions of complainant as to the competency of independent packers to pack tobacco in accordance with its requirements, it should, in fairness, be said that this evidence was to the effect that certain independent packers, with whom complainant had been doing business, could pack the tobacco in accordance with the high and rigid requirements of complainant, only because of the fact that they had, over a period of years, been educated by complainant in the best and most efficient methods of performing such packing operations. But such proof further disclosed that there were not nearly enough independent packers, whose methods would meet complainant's requirements, to supply its needs, and that the largest and best equipped plant for the packing of tobacco in Lancaster County was that which was owned and operated by the complainant, itself.

All of the foregoing indicates the problems and difficulties inherent in the case but is not decisive of the controversy. In arriving at our determination herein, it may be assumed, for the purposes of this case, that the purchase of tobacco which has been packed by the buyer for the seller is not a practice established in the industry; that the operation of the Regulation does not compel changes in the business practices of either the growers or the complainant—as representative of the industry; that a number of independent packers (but not a sufficient number), can pack tobacco in accordance with complainant's requirements; and that there is no proof of the extent to which complainant's production of cigars has been curtailed through alleged inability to obtain unpacked tobacco. These matters may be conceded, and yet it clearly appears, from the evidence, that as a result of the operation of the Regulation as interpreted, it is practically impossible for complainant to secure green tobacco for packing according to its special methods—as it has done for many years in the past. Moreover, it can be said that although complainant is not wholly dependent for its tobacco supplies upon purchases of unpacked tobacco from growers, it is largely dependent upon such purchases. And while it may be admitted that the provisions of the Regulation apply equally to all purchasers of tobacco, and do not single out complainant for separate treatment, nevertheless the operation of the Regulation as interpreted results in almost insuperable difficulties as far as complainant's conduct of its business is concerned. For, as above mentioned, complainant, which, for many years, has been one of the largest manufacturers of cigars in this country, is unable to secure

the kind of packed tobacco which is required for its type of cigars, inasmuch as the growers will not sell green tobacco that complainant might pack according to its special process, because of the inducement of the higher net price for packed tobacco, and, in addition, the Regulation prevents complainant from packing the tobacco for the grower according to its own process, and paying the growers the packed price. From everything that appears in the case, the fact seems undisputed that the growers will not sell any tobacco unless they receive the high price permitted by the Regulation for packed tobacco—whether they pack it themselves or have other packers do the job for them.

Notwithstanding the difficulties and hardships thus suffered by complainant, it would not follow that the Regulation was, consequently, invalid. On the other hand, the contentions of the Administrator in respect to these matters might well be sustained. But, as we have intimated, these are not the decisive considerations in the case. We come, then, to the determining issue.

Complainant contends that the Regulation subjects it to illegal discrimination. It claims that it should have the right to pack tobacco for growers, and to purchase such tobacco from the growers, as packed tobacco. It is apparently conceded that it has developed unique packing methods, and has the largest and most efficient packing facilities in Lancaster County. For, in addition to its business of manufacturing cigars, it also is, and has been throughout its history, in the business of packing tobacco, which is the first process in the making of cigars.

In discussing complainant's claim of discrimination, we are brought to a consideration of the circumstances surrounding the action of the Administrator, and the objective sought to be attained by the interpretation of the Regulation, prohibiting a manufacturer from packing tobacco for growers and later purchasing such tobacco as packed tobacco.

The Office of Price Administration first indicated its concern with the question here before us in its interpretation of Revised Maximum Price Regulation No. 494 dated January 8, 1945, to which reference has heretofore been made, and the text of which has been set forth in footnote 4 of this opinion.

In explaining why the Regulation was so interpreted, counsel for the Administrator insist that "if buyers were permitted to pay the higher price for tobacco they had packed for the seller, the ceiling price for unpacked tobacco would be rendered meaningless." This apparently means that, in such a case, every seller would sell his tobacco as packed tobacco at the higher price, instead of as unpacked tobacco at the lower price—or, in other words, there would be no tobacco sold as unpacked tobacco.

It was considered by the Office of Price Administration that the payment by the purchaser of the packed price for tobacco, which the purchaser had packed for the seller, circumvented and evaded the Regulation because it made the ceiling price for unpacked tobacco meaningless—or would result in every grower's selling his tobacco as packed instead of as unpacked tobacco to get the higher price. This same view was expressed also in the report and recommendations of the Board of Review, to which the protest was referred, in the following language:

"Normally, growers sold green tobacco to purchasers (including the Protestant) and purchasers (including the Protestant) bought green tobacco. Any other form of merchandising, whether by the use of custom packing or some other technique, was extraordinary. Increased demand for green tobacco resulted in strong price pressures on the commodity. Accordingly, in the interest of stabilization, the Administrator established maximum prices which have never been the subject of protest and are admittedly generally fair and equitable. The interpretation of January 8, 1945, was issued for the purpose of advising the trade of a prohibited practice which, if permitted, would result in an increase of those prices by evasion. In other words, the Protestant is asking the blessing of the Administrator with respect to a plan to pay more than the maximum established price—that it be permitted to accomplish by indirection that which it may not do directly."

The point at issue in the case is emphasized by the statement of facts in the Administrator's brief, in which it is said:

"The Price Administrator found that certain evasive practices had developed by which manufacturers or packers, in an effort to augment their supplies, agreed to pack tobacco for the account of the grower and to purchase the packed tobacco from the grower at the maximum prices estab-

lished for packed tobacco. On January 8, 1945, an interpretation was issued declaring that under the Regulation the higher maximum prices prescribed for packed tobacco may not be paid when the packing operation has been performed by the buyer."

In all of the foregoing is disclosed a concern on the part of the Administrator and the officials of the Office of Price Administration with a so-called evasive practice whereby growers were, generally, receiving the higher prices for their tobacco because they were selling it as packed tobacco, at the prices allowed for that commodity by the Regulation, and whereby, as a result, unpacked tobacco was being forced off the market and converted into packed tobacco. Apparently, the Administrator considered that the remedy was to prevent the manufacturers from packing for the account of growers and then purchasing the packed tobacco from them. This view led to some strange, and, perhaps, unexpected denouements.

It must be obvious why the ceiling price for unpacked tobacco would become "meaningless," as the Administrator feared. It would not be because the manufacturers would pack the sellers' tobacco and pay the higher price for such tobacco as packed tobacco. It was because the Regulation permitted a higher net price of 18% for such packed tobacco. It made no difference who packed it. It resulted in such a great increase in price that packers were swamped with business, and upon the issuance of the Regulation, a cooperative company was thereafter formed by the growers solely for the packing of tobacco. And the only reason for this, obviously, was to get the price of 18% more than for unpacked tobacco.

By his interpretation of the Regulation, the Administrator sought, as far as possible, to keep a large part of the tobacco crop available for sale on the market as unpacked tobacco; but his effort in this respect was overbalanced and frustrated by the inducement he offered to growers to secure an additional 18% by selling their product as packed tobacco. The manufacturer who then packed the tobacco for the growers and subsequently purchased it as packed tobacco was only paying to the growers the prices that they were bound to get anyway—even if they had to pack the tobacco themselves. And it is impossible to consider such a manufacturer's purchase, at packed prices, of tobacco which he had packed for a seller, as circumventing and evading the Regulation by causing the grower to secure higher prices for his tobacco than he otherwise would. In such a case, the blame for the resultant higher prices cannot be attributed to the manufacturer-purchaser of tobacco, which he has packed for the grower, but to the inducement of the additional 18% net price therefor authorized by the Administrator.

It is asserted by counsel for complainant in their briefs (and it is not denied), that when the Administrator was confronted by the probability that the operation of the Regulation would force tobacco, which normally had been marketed as unpacked tobacco, to be marketed as packed tobacco, he had in mind a remedy to avoid such a result. He did not wish to have all of the unpacked tobacco forced off the market and converted into packed tobacco. But at the same time he wanted to provide for a higher price for packed tobacco than for unpacked tobacco, "in order to compensate for the performance of a customary and well recognized function in the processing of tobacco," as he explained in his opinion filed in this case when stating what his purpose had been, in establishing maximum prices for packed tobacco. The remedy, therefore, advanced by the Administrator, according to the uncontradicted statement of complainant's counsel, was a proposal for the incorporation of a "grandfather clause" in the Regulation, which would have prevented growers from marketing their tobacco as packed tobacco unless such had been their established practice in some past period before the Regulation was issued.

Section 3(e) of the Act, however, provides that no action shall be taken under the Act by the Administrator in connection with agricultural commodities without the written approval of the Secretary of Agriculture. By Executive Order, the President transferred the authority of the Secretary of Agriculture to approve such maximum price regulations to the War Food Administrator. Executive Order 9334, 50 U.S.C.A.Appendix, § 601 note, 8 F.R. 5423. See discussion in California Lima Bean Growers Assn. v. Bowles, Em.App., 1945, 150 F.2d 964, 966. Complainant declares that when this proposal was made to the War Food Administration, such agency, interested primarily in having growers receive the highest possible prices for their

crops, refused to approve the "grandfather clause" suggested by the Administrator. So, the Administrator was apparently thus prevented from applying a remedy that would take care of the difficulties suggested in this case. ·We recognize, of course, that on the hearing of the protest before the Board of Review, complainant requested that there be incorporated into the record all communications between the War Food Administration and the Office of Price Administration with reference to the Regulation, and that such request was denied. But we are not considering, as record evidence, upon which our determination is based, any communications between the War Food Administration and the Office of Price Administration in this regard, but rather refer to the matter to bring into focus the views of the parties as to the utility of a "grandfather clause" to surmount the difficulties that arose over price control over the commodity in question.

The reply of the Administrator to the foregoing, however, as given in his brief, is that "the use of a 'grandfather' clause in the Regulation to prohibit growers from marketing their tobacco in packed form unless they had customarily done so has not been shown to be feasible". And he continues: "Consequently, complainant has not shown, nor does it appear, that there is available to the Price Administrator any practicable method of meeting its individual problem." Apparently, there was no practicable method of meeting any of the problems raised by the interpretation of the Regulation, for, within a month after entry of the order of the Administrator denying the protest, complaint was filed, and two weeks later, the Administrator washed his hands of the whole mess, for the future, by an order abolishing price control over the 1945 crop of the type of tobacco here in question.

It appears, therefore, that it was impossible for the Administrator to accomplish by the Regulation as interpreted the objectives to which it was directed, for he could do nothing by the use of any of its provisions to prevent the practice adopted by the growers of selling their tobacco as packed tobacco for the higher price; and there was no way in which he could keep the unpacked tobacco from being forced off the market and converted into packed tobacco. This being the case, the Regulation as interpreted could not be said to be required to effectuate any of the purposes of the Act. For the result sought to be achieved by the interpretation of the Regulation was to keep unpacked tobacco from being forced off the market, as well as to keep it from being converted into packed tobacco and sold at the higher price. And it was forced off the market and converted into packed tobacco, not because of the doing of anything that the interpretation professed to correct or prohibit with respect to a manufacturer's conduct or practice, but because of the higher price authorized by the Administrator for packed tobacco.

Complainant, as has been said, was engaged in the business of packing as well as in the business of the manufacture of cigars, and it contends that the Regulation unlawfully discriminated against it when it prohibited complainant from packing tobacco for a grower and then purchasing such tobacco as packed tobacco. It submits that it is as much entitled to pack tobacco as any other packer; and that it is entitled to purchase such packed tobacco on the same terms upon which any other buyer was allowed to purchase it. It claims that it is discriminated against in that the Regulation encourages, and even requires, growers to have their tobacco packed by others—if they are to receive the higher price; and that if complainant buys such tobacco packed by others, it is forced to pay a price reflecting the cost of packing, while it is deprived of using its own facilities in the performance of such packing operations. Moreover, complainant urges most emphatically that the effect of the Regulation as interpreted is to prevent it from acting as a packer and using the tobacco which it has packed according to its own standards; and that, in order to insure that tobacco which is packed by others complies with its own requirements, it would be compelled to unpack and repack all such tobacco at additional cost. This latter operation could not be generally undertaken because the purpose of packing is to induce fermentation, and once fermentation has set in, it would be too late to repack the tobacco.

In answer to the contention of the Administrator that the Regulation does not operate to discriminate against the complainant, because it imposes the same restrictions on all other manufacturers and purchasers from the growers, complainant submits that few, if any, of the other manufacturers and purchasers maintain their own facilities for packing, and that no oth-

510

er manufacturer has special packing requirements.

■ There can be no doubt that the Regulation as interpreted discriminates—in the ordinary sense of the word—against complainant. The determining consideration, however, is whether it discriminates unreasonably against complainant and is thereby arbitrary and capricious; and to that question, we now address our attention.

In Booth Fisheries Corporation v. Bowles, Em.App.1946, 153 F.2d 449, it was said:

"This court has held that unless the apparent discrimination is required to effectuate one of the purposes of the act a regulation must be held to be arbitrary and capricious if its provisions are such that all persons who are similarly situated are not dealt with upon an equal basis but greater burdens are laid upon one than are laid upon others in the same calling and condition. Consolidated Water Power & Paper Co. v. Bowles, Em.App., 1944, 146 F.2d 492; Hawaii Brewing Corporation v. Bowles, Em.App., 1945, 148 F.2d 846. Upon the application of this principle this court held a price regulation invalid because it subjected the complainant to a competitive handicap, not characteristic of the industry prior to price control, which was wholly unnecessary to effectuate the purposes of the act. Flett v. Bowles, Em.App., 1944, 142 F.2d 559."

The complainant, in the cited case, performed functions as a producer and processor of a commodity, as a so-called primary distributor, and as a wholesaler. The Administrator had fixed maximum prices at each of the above mentioned levels of distribution. According to the Regulation, the complainant was, by definition, a processor, and as such could charge certain prices. A wholesaler was authorized to charge higher prices. But complainant, although maintaining an integrated system of processing and distribution branches—including wholesale departments—could not, in its wholesale transactions, charge wholesale prices because it was a processor under the Regulation, and only persons *other than processors* could charge primary distributing, or wholesale prices.

Upon a complaint, filed by Booth Fisheries Corporation, charging unlawful discrimination, it was held that the fact that complainant maintained an integrated system of processing and distribution should not prevent it from charging the processing prices when it functioned as a processor, and wholesale prices when it functioned as a wholesaler; that, since the prices allowed to establishments that came within the classification of various kinds of sellers, as defined by the Regulation, were not determined by any criteria that differentiated them from the branches of complainant's integrated system, performing the same respective functions, the price discriminations against the different types of complainant's sellers, based on such classifications, were unjustified; and that there was nothing in the case to sustain the validity of classifications of sellers, as a result of which complainant—no matter what function it performed—was limited to charging processing prices. It was further observed that a consideration such as the fact that complainant operated at a greater profit than other wholesalers by reason of its integration in one system of all levels of distribution, was clearly without relevancy upon the issue whether the Regulation discriminated arbitrarily and capriciously against it and in favor of others of the same calling and condition.

The foregoing case is similar to the one before us in that we are here confronted by claimed discrimination against a party resulting from the circumstance that it is engaged in two functions—packing, and manufacturing cigars. The Regulation as interpreted forbids complainant, as a packer or manufacturer, from paying the same price for tobacco which it has packed for a grower, which another packer, or another manufacturer, is permitted to pay for the product so packed. Complainant is in the same calling and condition as other manufacturers of cigars. As a packer, it performs the same function as other packers; and as a manufacturer, it performs the same function as other manufacturers.

■ We have heretofore determined that the Regulation as interpreted is not required to effectuate the purposes of the Act inasmuch as it could not, and did not prevent the growers from selling their tobacco as packed tobacco for the higher prices, and could not, and did not keep the unpacked tobacco from being forced off the market and converted into packed tobacco. It follows that the discrimination which prevents complainant as a packer from functioning as a packer in this case, and which prevents it as a manufacturer from purchasing the tobacco which it has

packed, at the same price that other manufacturers were authorized to purchase it, is not required, and does not serve, to effectuate the purposes of the Act. In other words, the regulatory prohibition which prevents complainant's functioning as a packer in the same way that any other packer functions, and which prevents its purchasing, as a manufacturer at the same prices at which any other manufacturer purchases—simply because it functions both as a manufacturer and as a packer—is not essential to carrying out the purposes of the Price Control Act. Accordingly, the Regulation as interpreted must be held to discriminate unreasonably against complainant, in so far as it prohibits it from packing tobacco for a seller and then purchasing it as packed tobacco.

At this point, we come to the discussion of an additional reason given by the Administrator why the Regulation as interpreted is necessary to prevent evasive practices. In his opinion accompanying the order denying protest, the Administrator declared that a crucial problem was presented by the fact that, in order to obtain supplies in a short market, manufacturers were willing to custom pack "at a lower rate than the packer mark-up, enhancing the grower return by the difference," and that it was apparent that "the end result of these transactions is the same as if there had been outright payments for unpacked tobacco in excess of the grower ceiling prices." The first time this practice appears to have been mentioned, in the proceedings, was in the Administrator's opinion. Although the Interpretation issued by the Administrator was directed to evasive practices, nothing was said therein about a practice or willingness of manufacturers to custom pack at a lower rate than the packer mark-up thus enhancing the grower return. The only concern, disclosed at that time in the Interpretation, was that growers, manufacturers and packers had agreed to pack tobacco for the account of the grower, and subsequently to purchase such tobacco from the grower and pay the ceiling price for packed tobacco. Certainly, the objection to the practice of a manufacturer's packing for the account of a grower and subsequently purchasing the product as packed tobacco, was not an objection that had anything to do with the subject of packer mark-up. The objection embodied in the concern of the Administrator to the practice of a manu-

facturer's paying packed prices for tobacco it had packed for the grower, seems a far cry from an objection to the asserted device of packing at rates lower than the packer mark-up. Nor is the subject of packer mark-up mentioned in the Report and Recommendations of the Board of Review. From the brief for the Administrator, we are unable to ascertain whether any reliance is based upon the conclusion of the Administrator that manufacturers were "willing" to custom pack at a lower rate than the packer mark-up. At any rate, no specific reference is made in the brief to such finding, and any argument now addressed to the court on this particular point would seem to be an afterthought.

It is impossible to say, from our examination of the record, whether the Administrator considered such a practice of packing at a lower rate than the packer mark-up to be another phase of the claimed evasion of price control, in that it influenced the growers to sell for the higher prices allowed for packed tobacco and, so, drove unpacked tobacco off the market; or because of the fact that it would result in the grower's receiving more for his packed tobacco than if it had been packed by an independent packer, thus giving the grower higher prices for his product than he otherwise would have received.

If the Regulation as interpreted was directed to the former practice, that—as we have already indicated—was not one that the Administrator, in the light of all the circumstances in this case, could prohibit, without unreasonably discriminating against complainant and others who might be similarly engaged in the two functions of packing and manufacturing.

It may well be said at this point that what stands out above everything else throughout the case is that the whole controversy, from the Administrator's standpoint, is concern with an interpretation of the Regulation which was directed toward one thing—prevention of the general, and apparently universal, practice of the growers (indulged in after the issuance of the Regulation) of selling their tobacco as packed tobacco for the higher prices with the result that unpacked tobacco was forced off the market and converted into packed tobacco. The Interpretation, the Report and Recommendations of the Board of Review, and the opinion of the Administrator, generally— all were devoted to this objective. But, again, to repeat, the Regulation

as interpreted, directed against the above mentioned practice of a manufacturer's packing, and then buying the grower's tobacco, as packed tobacco, has been held by us to discriminate unreasonably against complainant.

There remains, then, for disposition, the question whether the Regulation as interpreted was necessary to prevent an evasive practice whereby a manufacturer might custom pack at a lower rate than the "packer mark-up," and by purchasing. the tobacco so packed, enhance the grower's return by the difference, and so, violate price control.

Here a brief explanation may clarify this issue. We have, generally, referred to the maximum price allowed for packed tobacco, as the price of the unpacked tobacco, plus the cost of packing, plus the mark-up of 18 percent. The cost of packing, it should be emphasized, which is permitted to be tacked on, is the *actual cost* of labor and material used in packing the tobacco, but does not include the packer's profit.

It is said by counsel for the Administrator that a manufacturer like complainant might charge the grower less than the "going price" for packing in order to induce the grower to sell the tobacco to it rather than to somebody else. It is to be remarked, however, that counsel for the Administrator stated on the argument that there was no showing of what an independent packer would charge, as there was no control over that price. Hence, we are constrained to conclude that there was no actual "going price" for packing, and that a price so described was entirely suppositious. Furthermore, contrary to counsel's assertion, there was indeed a control over the maximum price for such a service as packing tobacco, under the general maximum price regulation which set maximum prices for all services and service industries. As far as a minimum charge for packing goes, such a charge, below actual cost, could well, in this case, be evasionary.

Of course, while the grower may tack on to his price for packed tobacco the actual cost of labor and material used in the packing, he cannot, under· the Regulation, include therein. the packer's item of profit. Whatever may be the amount of this item paid the packer, comes out of the grower's own pocket—or, in other words, reduces the amount of the net price which he can charge for the packed tobacco. The less the grower pays to the packer in addition

to the actual cost of labor and material, as the latter's profit, the more the grower's own return on the sale of the tobacco is enhanced. It is submitted that there would be no inducement for an independent custom packer to charge such a lower price, because he is in the packing business for profit. To this complainant answers that if it charged a packing price below the actual cost of packing the tobacco, that would be an evasive practice, and that it would be the kind of evasive practice which would present an enforcement problem. But, in any event, it would not seem to be evasive —and we cannot find that such a contention is made by the Administrator—for one packer to charge less than another for the packing operation, provided the actual cost of labor and material be charged to the grower.

Certainly, the cooperative packing company heretofore mentioned would not be required to charge more than actual cost of labor and material. As a matter of fact, such cooperative would not secure a profit from the grower, because it would be part of the grower's own business. Consequently, the cost of packing by the cooperative would be tacked on to the price of the unpacked tobacco and the grower would receive the entire 18 percent additional price allowed for packed tobacco. We find no apparent intention in the Regulation as interpreted that the cooperative packer should be given favored treatment over other packers, and we would accordingly conclude that, as long as·a packer did not pack below cost, he would not be considered to be engaged in an evasive practice—as far as packer mark-up is concerned.

It is understood, assuredly, that the Administrator has the right to frame his regulations in any reasonable way so as to minimize the enforcement problems and prevent evasionary practices in the first instance rather than being obliged to police them afterward. Yet it appears that a possible evasion resulting from a manufacturer's packing at less than cost presents, fundamentally, a matter for enforcement, rather than the complete prohibition of a manufacturer's engaging in the packing business. A regulation which operates to prevent an old and established manufacturer from packing its tobacco by a secret process which it has used throughout its business existence; which, in effect, enforces the idleness of its immense pack-

ing facilities that are capable of packing more than 50 percent of the entire tobacco crop in question; and which results in its being deprived of its supplies (or a considerable part of its supplies) of the tobacco required for the manufacture of its product—merely on the ground that an enforcement problem as to whether it packed for a grower, below cost, might otherwise be created—would be unreasonable, and hence invalid as discriminatory against such a manufacturer.

Moreover, we see no reason why the Regulation might not be so drawn as to avoid this particular anticipated evasive practice. In the Booth Fisheries case, supra, where the Administrator also contended that the provisions of the Regulation there in question were necessary to prevent evasive practices, the court said that it saw no reason why the Regulation could not be so drawn as to eliminate the discriminations against the complainant, without permitting any such abuses, as the Administrator feared, by the complainant and others who might be similarly situated.

From the foregoing, it is our conclusion that the Regulation as interpreted did unreasonably discriminate against the complainant and was invalid in so far as it prohibited it from packing tobacco for the account of a seller and thereafter purchasing such product as packed tobacco. A judgment will accordingly be entered setting aside Section 2(a) (9) of Revised Maximum Price Regulation 494 in so far as that subsection precludes a grower from being deemed a packer within the meaning of Section 4 of the Regulation in transactions where a manufacturer has custom packed the tobacco for the grower's account and then has purchased such tobacco from the grower.

MAGRUDER, Judge (dissenting).

The unusual feature of this case is that a buyer is protesting because it is not allowed to pay more than the ceiling price for a commodity. However, since the regulation forbids the buyer to offer or to pay more than the ceiling price, the buyer is "subject to" the regulation and has standing to protest. Cf. Buka Coal Co. v. Brown, Em.App., 1943, 133 F.2d 949, 951-52. We therefore must consider the merits of the complaint.

The regulation is not discriminatory against complainant, for it treats alike all cigar manufacturers who desire to purchase green or packed tobacco. Nor does the regulation prohibit complainant from acting as a custom packer for growers. As a matter of fact, apparently complainant has never been a custom packer. Complainant is a manufacturer of cigars who in the past has preferred to buy its tobacco green and pack the same by its own processes and with its own facilities. The regulation as interpreted forbids growers to charge the ceiling price for packed tobacco when the packing is done by the buyer rather than by the seller. It is difficult for me to see why this is not a perfectly reasonable provision.

Prior to price control, I suppose there was a more or less constant differential between the market prices of green and packed tobacco, the difference representing the cost of the packing operation plus a margin of profit for the packer. If a cigar manufacturer wanted to do his own packing, he would naturally buy the green tobacco from the grower. He would not go through the rigmarole of custom-packing the tobacco for the account of the grower and then buying the tobacco from the grower as packed tobacco. Prior to price control, a group of growers might have decided that they wanted to perform the packing function and obtain the additional profit derived therefrom. They might then have formed a co-operative to do the packing, thereafter selling the tobacco at the market price for packed tobacco. If a cigar manufacturer had wanted to buy the green tobacco of those particular growers, he might have had to offer them somewhat more than the current market price for green tobacco in order to induce them to forego their packer profits. This would certainly have been so if such growers had a ready market elsewhere for their tobacco in packed form.

No attack is made here upon the reasonableness of the maximum price for green tobacco prescribed in the regulation. Presumably the higher maximum price established for packed tobacco allows a reasonable margin of profit for the packing operation. This must be so, because the growers have found it to their advantage to perform the packing function through co-operatives. It is not improper for them to do this, and it is not easy to see how complainant may justly complain because the regulation permits them to do so and makes it profitable for them to do so. There is no showing that the established maximum

514

price differential between green and packed tobacco is out of line with the historic differential as it existed prior to price control. It may be that complainant cannot now obtain all of the particular green tobacco which it would like to buy, though the record is not as clear as it might be as to whether this inability is due to the operation of the regulation. But assuming in complainant's favor that its purchase of green tobacco is hampered by the fact that it cannot offer growers more than the ceiling price for green tobacco in order to induce them to forego the profit they stand to make from performing the packing operation, it does not follow, in my opinion, that the regulation is invalid because it forbids growers to charge the ceiling price for packed tobacco when the packing is done by the buyer rather than by the seller.