**G. R. KINNEY CO., Inc., et al. v. PORTER, Price Administrator.**

No. 338.

United States Emergency Court of Appeals.

Heard at New York Aug. 14, 1946.

Decided Oct. 21, 1946.

Edward F. Seligman, of New York City (Benjamin Seligman, of New York City, on the brief), for complainant.

James 'A. Durham, Atty., Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, and Carl A. Auerbach, Associate Gen. Counsel, both of Office of Price Administration, both of Washington, D. C., and William R. Ming, Jr., Chief, Court Review Price Branch, Office of Price Administration, of Chicago, Ill., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MARIS, Chief Judge.

Each of the complainants owns and operates many retail shoe stores throughout the country at which women's hosiery is sold in addition to women's shoes. They jointly protested Maximum Price Regulation No. 602 [1] which establishes specific dollars-and-cents maximum prices for women's nylon hosiery. The protest was denied. This complaint was then filed pursuant to Section 204(a) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A. Appendix, § 924(a). The complainants seek to have MPR 602 declared invalid and set aside by this court as not in accordance with law and as arbitrary and capricious.

Retailers are subdivided in the regulation into "chain stores and mail order houses" [2] and "other retailers." Specific dollars-and-cents maximum prices are set forth in Appendix B of the regulation for sales at retail by "chain stores" and by "other retailers." As to retailers other than chain stores higher maximum prices are established for sales at retail of hosiery purchased by them from wholesalers than when purchased from manufacturers. For chain stores the maximum prices are lower than for other retailers and no distinction is made as to the source of supply. A chain store, as defined in Section 2(a) (1) of the regulation, is "a store which is one of a group of five or more commonly owned or controlled retail stores which, as a group, had in any calendar year since 1938 an 'average percentage of initial markup' of 34 percent or less on women's full length hosiery." [3]

---

[1] 10 F.R. 14251.

[2] Since mail order houses are not involved in this complaint the group referred to in the regulation as chain stores and mail order houses will hereafter in this opinion be referred to as chain stores.

[3] Since the filing of the complaint in this court on May 24, 1946 the regulation has been amended in several respects here relevant. By Amendment 3 to MPR 602 (11 F.R. 6668) issued June 17, 1946, the definition of a chain store in

Section 2(a) (1) was changed so that it now reads:

"a store which is one of a group of five or more commonly owned or controlled retail stores. However, if half or more of the stores which comprise the group were in the business of selling women's full length hosiery prior to January 1, 1943, and these stores, considered together, had an 'average percentage of initial markup' of more than 34% on women's full length hosiery during each of the calendar years 1939, 1940, 1941 and

The complainants are chain stores within the definition of Section 2(a) (1) of the regulation. They attack the regulation upon two grounds. First they contend that the classification of retailers into two distinct groups, to wit "chain stores" and "other retailers" is indefensible. The second ground is that, assuming arguendo that the classification may be justified, the regulation unfairly discriminates against chain stores insofar as it holds such retailers to one maximum price for unbranded nylon hosiery[4] without regard to the source of supply but permits other retailers higher maximum prices upon hosiery purchased by them from wholesalers than upon hosiery purchased by them from manufacturers.

The basic attack is upon the classification of retailers into "chain stores" and "other retailers." The Administrator supports his classification by the results of studies as to the prewar operating experience of retailers which discloses that the margins enjoyed by chain stores were historically lower than those enjoyed by other retailers. The complainants concede that shoe chain stores traditionally sold rayon and silk women's hosiery at lower margins than did other retailers. They did so, the complainants explain, because women's hosiery was used as a "leader" by such stores in order to attract trade. With the advent of nylon hosiery, however, the shoe chain stores, they say, pursued a pricing policy which made their nylon hosiery departments self sustaining. They submit a summary of a survey covering approximately 30 chains of shoe stores for the years 1941 and 1942 which discloses that they received higher margins on the sale of nylon stockings in those years than they do under the regulation. Nylon hosiery, they urge, is a product separate and distinct from rayon or silk both in its physical properties and methods of manufacture. Consequently, they contend, data which is a composite of the operating experience of retailers as to all women's hosiery, whether the fabric used is rayon, silk or nylon, is misleading and that the establishment of maximum prices for nylon hosiery by the application of historical margins received on all women's hosiery by retailers is arbitrary and capricious.

We cannot accept the premise that the retailing of women's nylon hosiery is intrinsically a different industry from the retailing of women's rayon or silk hosiery. Differences of physical properties and methods of manufacture might have a direct bearing upon the maximum prices established for the manufacturer but have no relationship to the distributive functions performed by retailers for which they are allowed their markups. The same sales force, the same displays, the same merchandising overhead are involved in the sale of nylon hosiery as in the sale of that made of rayon or silk. We think that reliance upon data which comprehended the operating experience of retailers as to all women's hosiery is wholly realistic and rational and that a classification of retailers constructed upon the results of such a study is neither arbitrary nor capricious.

The complainants argue that not only was the classification of retailers arbitrary and capricious but that it was unnecessary to effectuate the purposes of the act. They point to Maximum Price Regulation No. 95, the first regulation specifically dealing with retail sales of nylon hosiery, and stress that in that regulation the Administrator established uniform ceiling prices for all retailers without a classification as to types of retailers. The Administrator calls attention to the fact that MPR 95 was issued by him in response to the urgent and immediate need to protect shoppers during the Christmas season of 1942. At all events the act does not demand that once the Administrator has utilized one plan of price control by the pro-

---

1942 (or during each of these specified calendar years in which such stores were in business) then, upon filing the computation set forth in (ii) below, such group of stores will be exempt from the chain store classification."

[4] By the issuance of Amendment No. 1 to the regulation on January 30, 1946,

which was subsequent to the filing of the protest with the Administrator but prior to the filing of the complaint in this court the same maximum price has been established for branded nylon hosiery irrespective of what type of retailer makes the sale. (11 F.R. 1154)

mulgation of a regulation he may not later change to another. On the contrary, effective price control requires that the Administrator constantly revise his regulations in the light of his studies and experience. In this case his studies convinced him that the prices established by MPR 95 were inflationary and that the purposes of the act would best be served by establishing different maximum prices for the two classes of retailers. We find that his conclusions in this regard are sustained by the evidence.

We find more merit in the complainants' contention that the regulation does not deal equally with "chain stores" and their competitors "other retailers." As we have seen, under the regulation retailers other than chain stores may charge more for hosiery purchased by them from wholesalers than for that purchased by them from manufacturers, whereas chain stores are held to one level of maximum prices without regard to their source of supply.[5] The Administrator asserts that the differential pricing schedule merely gives recognition to purchasing policies pursued by retailers in the prewar period. We do not think the facts officially noticed and relied upon by the Administrator sustain him upon this point.

It appears from the statement of economic data and other facts officially noticed and relied upon by the Administrator that in the prewar period small independent retail stores "have always purchased the bulk of their women's hosiery from wholesalers," department stores and large independent retailers "have generally purchased the bulk of their women's hosiery from manufacturers" and chain stores and mail order houses have "always purchased women's hosiery in large quantities from manufacturers." It thus appears that while there would be historical justification for a regulation which imposed upon small independent retailers a single scale of prices based upon purchases from wholesalers and at the same time imposed upon department stores and large independent retailers another scale of prices based upon purchases from manufacturers, there is no such justification for placing these two groups in a single category and giving them each both scales of prices while denying similar treatment to chain stores. MPR 602, however, does give to department stores and large independent retailers who customarily purchased the bulk of their hosiery from manufacturers two scales of prices, one for hosiery purchased from manufacturers and the other and higher one for hosiery pur-

---

[5] To illustrate: Table 1 of Appendix B of Maximum Price Regulation No. 602 originally provided, inter alia:

At retail (per pair)

|  | By chain and mail order houses | Of unbranded buying from manufacturers | Of branded or buying from wholesalers, also house to house |
|---|---|---|---|
| 51-gauge |  |  |  |
| all nylon | 1.35 | 1.54 | 1.55 |
| nylon leg | 1.20 | 1.35 | 1.40 |

The comparable portion of the table as amended by Amendment 3 to MPR 602 now reads:

At retail (per pair)

|  | Unbranded by chain and mail order houses | Of unbranded buying from manufacturers | Of branded or buying from wholesalers, also house to house |
|---|---|---|---|
| 51-gauge |  |  |  |
| (a). 30 denier and coarser |  |  |  |
| all nylon | 1.35 | 1.45 | 1.55 |
| nylon leg | 1.20 | 1.35 | 1.40 |
| (b) finer than 30 denier |  |  |  |
| all nylon | 1.45 | 1.60 | 1.70 |
| nylon leg | 1.35 | 1.45 | 1.55 |

chased from wholesalers, while at the same time it denies more than one scale of prices to chain stores whose historical source of supply was the same as that of the department store group. There appears to be no historical justification for this discrimination against the chain stores.

Nor can the regulation be justified upon the ground that it merely preserves the prewar margins. The economic data relied upon by the Administrator discloses the following prewar margins for all hosiery:

|  | Purchases from Manufacturer | Purchases from Wholesaler |
|---|---|---|
| Chain stores | 31% | negligible purchases |
| Department stores | 37.5% | " |
| Small retailers | negligible purchases | 30.5% |

The margins realized under MPR 602 are as follows:

|  | Purchases from Manufacturer | Purchases from Wholesaler |
|---|---|---|
| Chain stores | 31% | 18.7% |
| Department stores | 37.5% | 30.5% |
| Small retailers | 37.5% | 30.5% |

On purchases by chain stores from wholesalers, therefore, margins are reduced by the regulation by 12.3 percentage points or 40% of the margin, whereas on purchases by department stores from wholesalers margins are reduced but 7 percentage points or 19% of the margin.

It is equally clear that the admitted discrimination cannot be justified on the basis of the comparative size of the retailer since the number of retail outlets rather than the volume of sales is the factor which determines whether the retailer is to be classified as a chain store. It is quite possible for a department store with less than five retail outlets to have many times the sales volume of a group of chain stores.

To a certain degree the Administrator has recognized that the regulation might discriminate against chain stores. In. the statement of considerations accompanying MPR 602 the Administrator says:

"Operators of chain stores have complained that they have been increasingly compelled to purchase women's hosiery from wholesalers whereas their pre-war practice was to buy principally from manu-facturers directly. Full-fashioned hosiery purchased by chains at wholesale must be sold by them at the same prices as would obtain if purchased from manufacturers. The margin allowed to chains on direct purchases is 30.5 percent, but if chain stores buy from wholesalers the margin drops to less than 19 percent. The 'squeeze' which would result from this shift in the chains' normal source of supply is apparent. In recognition of this problem a provision has been inserted which limits manu-facturers' sales to non-retailers to the percentage of such sales in 1941. This kind of provision has worked well in limiting the amount of hosiery sold as 'branded' and it is expected that the limitation will work equally well in restoring the normal pattern of distribution. In the opinion of the Administrator, this provision should afford requisite relief to the chains."

But the manufacturer limitation on sales to non-retail purchasers which the Administrator thus relied upon in constructing the regulation is no longer legally permissible. The Price Control Extension Act of 1946, § 8, modified Section 2(j) of the Emergency Price Control Act so that it now reads:

" * * * Nothing in this Act shall be construed * * * (5) as authorizing any regulation or order of the Administrator to fix a quantity or percentage of any product which any seller may sell to any buyer."

The discrimination against chain stores to which the complainants point is therefore without the support which the Administrator originally claimed for it. We have seen that it is without historical justi-

fication and there is no showing that it is required in order to effectuate the purposes of the act.

■ In Booth Fisheries Corporation v. Bowles, Em.App., 1946, 153 F.2d 449, 451, we said:

"This court has held that unless the apparent discrimination is required to effectuate one of the purposes of the act a regulation must be held to be arbitrary and capricious if its provisions are such that all persons who are similarly situated are not dealt with upon an equal basis but greater burdens are laid upon one than are laid upon others in the same calling and condition. Consolidated Water Power & Paper Co. v. Bowles, Em.App.1944, 146 F. 2d 492; Hawaii Brewing Corporation v. Bowles, Em.App.1945, 148 F.2d 846."

■ The principle thus stated is applicable here. Upon its application MPR 602 must be held invalid for failure to accord to chain stores the two classes of prices which are accorded to department stores and large independent retail stores.

A judgment will be entered setting aside Maximum Price Regulation 602 insofar as it establishes for chain stores one set of maximum prices on women's nylon hosiery whether purchased by them from manufacturers or wholesalers.