**FLETT v. BOWLES, Price Administrator.**
**No. 7.**

United States Emergency Court of Appeals.
Heard at Chicago Jan. 14, 1944.

Decided May 5, 1944.

As Amended June 12, 1944.

Harry M. Brostoff, of Chicago, Ill. (J. Norman Goddess, of Chicago, Ill., on the brief), for complainant.

John O. Honnold, Jr., of Washington, D. C. (Richard H. Field, Acting Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Henry S. Sellin, James A. Durham, and Miss T. Mildred Kushner, Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

Complainant here challenges the validity of a provision of Maximum Price Regulation No. 30—Wastepaper, which authorizes paper mills to pay certain allowances, in addition to the specified maximum prices, to sellers who took title and warranted the merchantability of wastepaper packed by a prior vendor.

The Price Administrator, pursuant to authority of Executive Order April 11, 1941, No. 8734, first instituted price control over wastepaper through Price Sched-

ule No. 30, issued on September 18, 1941, effective October 1, 1941. 6 F.R. 4822. On October 29, 1941, the Administrator introduced into the price schedule a provision authorizing the payment of so-called jobbers' or brokerage allowances. 6 F.R. 5535, 5536. This brokerage provision was amended, in respects not now material, on December 15, 1941, 6 F.R. 6457, 6459, and on February 2, 1942, 7 F.R. 660, 661. Meanwhile, on November 4, 1941, Flett had filed a petition with the Administrator objecting to these allowances on the ground that they discriminated against his type of marketing operation. This petition was pending before the Administrator when the Emergency Price Control Act was passed, 56 Stat. 23, 50 U.S.C.A. Appendix, § 901 et seq., and administrative consideration of the petition continued after February 11, 1942, when Price Schedule No. 30 became effective under § 206 of the Act. On February 21, 1942, the price schedule, still containing the brokerage provision to which Flett was objecting, was republished as Revised Price Schedule No. 30—Wastepaper. 7 F.R. 1201, 1260. Having been advised informally by representatives of the Office of Price Administration that the relief requested in his petition would not be granted, Flett on April 18, 1942, filed with the Administrator a formal protest against the brokerage provisions of the price schedule.

It would have been too late on April 18, 1942, to file an original protest against this provision of the price schedule. Harlem Metal Corp. v. Brown, Em.App.1943, 136 F.2d 242, 244. However, Flett's petition, dated November 4, 1941, set forth specific objections to the brokerage provisions, and contained the substance of a statutory protest. This petition was treated by the Administrator as being still pending before him on and after February 11, 1942, the date on which he took office under the Emergency Price Control Act. The Administrator accordingly acknowledges, we think rightly, that this petition should be treated as a statutory protest filed as of February 11, 1942, and that the protest filed April 18, 1942, should be deemed an amended protest, curing formal defects in the original protest. See United States v. Kales, 1941, 314 U.S. 186, 194, 62 S.Ct. 214, 86 L.Ed. 132. The protest was denied on the merits by order of the Administrator dated August 20, 1942, and Flett duly filed his complaint in this court on September 18, 1942. We have jurisdiction to pass on the merits of the complaint.

On November 19, 1942, complainant filed in this court his application for leave to introduce additional evidence. Upon consideration of this application and of the stipulation of the parties agreeing thereto, this court on November 30, 1942, granted the application and ordered that such additional evidence should be presented to the Price Administrator together with such other evidence as the Administrator might deem necessary or proper to receive. Pursuant thereto, the Administrator received oral testimony and other evidence, and on October 23, 1943, issued a supplemental opinion adhering to his earlier conclusion that the protest should be denied. A supplementary transcript of these further proceedings before the Administrator was subsequently filed in this court.

For an understanding of the case, some outline needs to be given of the organization of the wastepaper industry as it existed prior to price control.

Paper mills are large consumers of wastepaper as a substitute for wood pulp in the manufacture of paper board, paper containers of all sorts, writing, printing, book or other converted papers, roofing materials, wallboard of various kinds, and many specialty products. The primary sources of wastepaper are homes, offices, hotels, stores, and other business establishments. Business houses and institutions which in the course of their operations accumulate wastepaper as a by-product are referred to as industrial producers or industrial accumulators. The quantity of wastepaper available to consuming mills varies directly with the price, but the quantity derived from industrial producers depends upon the extent of their main operations rather than upon the price of wastepaper. Thus the increase in supply of wastepaper when prices are raised comes largely through increased activities of peddlers and others who collect wastepaper from households, small stores, dumps, etc.

Peddlers are the most numerous of the various groups of persons engaged directly in the wastepaper industry. In the city of Chicago, for example, it has been estimated that the number of peddlers engaging in the collection of wastepaper may vary from 5,000 to 15,000, depending on the price of paper. The peddler performs the scavenger function, gathering paper

from any available source, in an unsorted and unbaled condition.

Directly above the peddler in the hierarchy is the junk shop, which purchases wastepaper (and other waste materials) from the peddler, paying on the average from about $3 to $3.50 per ton below the market price of wastepaper prevailing at consuming mills, and deriving its profit from this differential on resale. The junk shop undertakes to segregate the miscellaneous assortment of wastepaper into various grades, such as newspapers, magazines, or books, packed and baled so as to be ready for mill consumption without further processing. Such wastepaper, so processed, is customarily sold then to a middleman on a higher level who in that type of transaction is called a broker. In such sales the junk shop warrants the merchantable quality, weight and grade of the paper and is primarily responsible for defects which may appear. The broker, in turn, then sells the wastepaper without further processing to a paper mill, giving his own warranty as vendor in this transaction.

The number of persons in the industry who are brokers and nothing more is negligible.

By far the greater number of persons in the distribution level above junk shops are broker-dealers, who perform two distinct types of operation. First, they perform the broker's operation, namely, that of seeking out sources of supply of wastepaper which has already been segregated and packed for direct mill consumption, purchasing the same and reselling it to consuming mills at a profit, the seller giving warranties of title and merchantability. Second, they perform what is known as a dealer's operation, that is, they purchase wastepaper which is in need of further processing before sale to consuming mills, segregate and pack the same, and sell it in turn to consuming mills with a warranty of title and merchantability or, in some instances, sell it to a broker middleman. In their capacity as dealers they consequently operate sorting and packing plants as an adjunct of their operations, and their profit lies in the margin between the cost to them of purchasing the miscellaneous unsorted paper, plus the cost of processing the same, and the price obtained by them on subsequent sale of the graded and baled paper. To some extent, apparently, wastepaper dealers would buy miscellaneous wastepaper from peddlers, but for the most part dealers collected unsegregated wastepaper from industrial accumulators and other larger sources of supply. To some extent, also, dealers would resegregate wastepaper obtained from junk shops, extracting therefrom the more valuable material, the better and more refined grades, and repack the same for sale.

The consuming mills have not been equipped to segregate and grade miscellaneous wastepaper, and consequently they purchase only wastepaper which has previously been segregated and baled in the appropriate grades. Prior to price control, according to testimony by Flett it had been the practice of consumer mills to fix monthly prices for the various grades of wastepaper by agreement among themselves. A mill in purchasing a quantity of already processed wastepaper had no occasion to inquire of its vendor whether such vendor had himself performed the operation of processing the paper or whether he had acquired the paper from a prior vendor in a condition suitable for direct mill consumption without further processing. In either case the mill paid its vendor the same price, and such vendor gave the mill his warranty of title and merchantability.

The Flett organization, which has been in the wastepaper industry since 1924, has a method of operation different from that of either broker or dealer as above described. Flett acts as the exclusive selling agent for large industrial accumulators of wastepaper. The dollar value of sales negotiated by him in the year 1940–41 amounted to almost $2,500,000, perhaps two to three times as great a volume as that of the largest dealer in the country. Flett has offices in Chicago, Cleveland, New York and Boston. When he started in business he found that most industrial accumulators of wastepaper did not segregate it by grade or pack it in a form suitable for direct sale to consuming mills, but rather sold it in bulk to dealers who would subsequently process it for sale to mills. In order that industrial accumulators might obtain the best market price for their paper, Flett undertook to educate and train their staffs in the routine of segregating wastepaper according to grade at the time it came into existence as wastepaper. As a result of this training such industrial accumulators were enabled to segregate the wastepaper material without greater cost to themselves, and they could

sell the wastepaper, properly processed, direct to the paper mills at the full mill price. Flett operates under long term contracts with his clients, under which he is designated as exclusive agent for the sale of their wastepaper. He undertakes to obtain for his clients a price equal to the market price for the various grades of wastepaper prevailing at the mills in the districts in which his clients operate. He does not take title to the wastepaper, nor does he give his personal warranty to the purchasing mills. The usual warranty of title and merchantability is given by his clients who are directly the vendors. For his services as agent Flett receives from his clients a commission of 5% on the net sales price per ton.

There is some dispute in the record as to how far, prior to price control, brokers were in competition with Flett in obtaining and disposing of wastepaper graded and packed by industrial accumulators as a by-product of their business. Apparently such competition did exist to some extent, but it was on a fair competitive basis, because a broker in order to have a margin of profit for himself upon resale would have to offer the industrial accumulator a price somewhat less than the prevailing mill price.

When the Price Administrator extended price control to the wastepaper industry by the issuance of Price Schedule No. 30, effective October 1, 1941, he established ceiling prices only at the level of sales of wastepaper to the consuming mills. Originally the maximum prices for the various grades which the vendor could charge the consuming mills were the same whether such vendor had bought the paper from a prior vendor already fully processed for mill consumption or had acquired the paper in unsegregated form and had himself segregated and packed it.

However, according to evidence in the record, it soon became apparent that the price schedule, as originally promulgated, was causing or threatening to cause serious dislocations in the normal channels of distribution in the wastepaper industry. At that time the industry was in a period of a "tight" market in which the demands of consumer mills for wastepaper greatly exceeded the current available supply. Mills that found it feasible to do so went directly to junk shops and offered them the full ceiling prices. As long as this situation existed, junk shops naturally were unwilling to sell wastepaper to brokers at less than the ceiling prices for sales to paper mills. Hence brokers who had formerly supplied consuming mills with wastepaper found it no longer possible to perform this function, which depended for its profit upon a margin between the prices paid to junk shops and the prices received from consuming mills upon resale. As the Administrator explained in his supplemental opinion: "* * * most mills were not equipped to bypass brokers and secure wastepaper from primary sources of supply. In general, mills were not equipped to deal with the numerous small junk shops who collected and packed paper, but had established their organization in such a way as to depend upon brokers to bring together the sources of wastepaper, to guarantee standards of merchantability, and to finance the transaction. The situation was made more acute by the fact that with brokers unable to perform their usual function, a few mills were given an undue advantage in the scramble for wastepaper. Certain of the larger mills had established purchasing agents located in the metropolitan markets; other mills were physically located near metropolitan supplies of wastepaper and thereby had relatively ready access to primary sources of wastepaper. The net result was a serious derangement of the normal flow of wastepaper from producing points to consuming mills, curtailing the supplies of mills not advantageously located and threatening their production of materials needed in the war program."

If something had not been done to correct the situation it is likely that the consuming mills which were suffering the disadvantage just described would have had to establish their own purchasing agents in the metropolitan areas, a procedure which would have added substantially to their cost of procuring wastepaper. Accordingly, the Administrator, effective October 29, 1941, amended the price schedule by inserting a provision authorizing consuming mills to pay a so-called brokerage allowance in addition to the full ceiling price to vendors who have performed a defined "brokerage" function, the salient features of which are taking title and warranting the merchantability of wastepaper which has been processed and packed ready for direct mill consumption by a prior vendor. 6 F.R. 5535, 5536. As has been previously indicated, this brokerage provision

has been several times amended, mainly to take care of certain enforcement difficulties, but the characteristic features of the brokerage allowance have been retained throughout and have been consistently objected to by the present complainant. Revised Price Schedule No. 30, as amended, was on November 21, 1942, renumbered and reissued as Maximum Price Regulation No. 30—Wastepaper. 7 F.R. 9732. The challenged brokerage provision then became § 1347.14, Appendix A (g). As since amended (8 F.R. 7350 and 8 F.R. 13,-049) and as it now reads the provision is as follows:

"(g) Brokerage. (1) In the event that a consumer of wastepaper shall purchase wastepaper through a broker as defined in Sec. 1347.11(a) (11), hereof,[1] such consumer may pay such broker not more than the maximum price herein plus a broker's allowance not to exceed the following percentages of the price per ton of the amount actually paid to the broker, exclusive of the broker's allowance:

| Price per ton for grade of wastepaper purchased: | Broker's allowance in percentage |
|---|---|
| Up to $20.00 | 4 |
| $20.01 to $30.00 | 5 |
| $30.01 to $40.00 | 5½ |
| $40.01 to $50.00 | 7 |
| $50.01 to $60.00 | 8 |
| $60.01 and up | 9 |

"(2) The maximum prices established in Sec. 1347.14, Appendix A, can in no case be augmented by more than one brokerage allowance for each ton. In no event shall a person receive brokerage or the proceeds of brokerage on wastepaper packed by him or by any person with whom he has any connection consisting of any community of ownership or other beneficial interest, profit sharing arrangement, agreement for division of losses, or control based on close family relationship. In no event shall a person receive brokerage on the pack of another person pursuant to any contract, agreement, or understanding of any sort whatsoever between the two, whereby each is to sell, and charge brokerage on, the pack of the other. In addition to the price paid by the consumer, a broker may receive a broker's allowance

only from a consumer, and only if the transaction in question fulfills all of the following requirements:

"(i) The broker records the name or names of his vendor, or vendors, in each transaction, the quantity and grade of wastepaper purchased, the price f. o. b. point of shipment paid by such broker, the name of his consuming purchaser, the method of shipment to such consuming purchaser, the price paid by such consuming purchaser, and the broker's allowance.

"(ii) The sale is made by the broker to the consumer.

"(iii) The wastepaper sold by the broker to the consumer has been completely prepared for delivery by a person other than the broker.

"(iv) The broker guarantees the merchantable quality of the wastepaper.

"(v) The broker's allowance in such transaction is shown as a separate item on the invoice. This invoice must contain a statement that the broker has had no part in the preparation of the wastepaper covered, prior to its delivery to the consumer, and that the charges are not in excess of those established in this Maximum Price Regulation No. 30.

"(vi) The broker's allowance is not split or divided with any other person.

"(vii) All pertinent provisions in this Maximum Price Regulation No. 30 are strictly complied with."

The effect of the brokerage provision has been to enable brokers to offer junk shops prices for segregated and baled wastepaper as favorable as prices which could be offered by consuming mills which have facilities for bypassing brokers and purchasing directly from junk shops. Thus the broker's function has been preserved for the benefit of the greater number of paper mills which are not presently equipped to procure their supplies directly from the junk shops.

But complainant objects that the brokerage provision has subjected his type of operation to a competitive disadvantage which did not exist prior to price control, that is, it has enabled brokers to offer industrial accumulators the full ceiling prices, whereas industrial accumulators who sell their wastepaper to consuming

---

[1] The definition referred to is as follows: " 'Broker', commonly known as a wastepaper broker, means any person who sells to consumers wastepaper not packed by such person, and purchased by such person in the condition in which it is to be delivered to the consumer."

mills through Flett's agency may only receive, net, the ceiling prices minus the 5% commission paid to Flett under the terms of his agency contracts.

It does not appear that Flett's business has yet suffered any disastrous consequences from this obvious competitive disadvantage. He has not lost any of his existing clients (who perhaps have stuck by him pending the outcome of this litigation), and in fact the total tonnage of Flett's sales has increased somewhat since the advent of price control. But since October, 1941, during periods when the wastepaper market was "tight" Flett has been unable, naturally enough, to obtain any new clients. This interruption of the normal expansion of his business is probably attributable to the competitive handicap under which he labors. as the result of the brokerage provision. In the long run Flett has every reason to anticipate an adverse effect upon his business if the brokerage provision remains unchanged. He has a standing to protest even before the reasonably anticipated effects of this new competitive disadvantage have matured in actual losses; indeed, if he had failed to protest when he did, and had waited until such losses occurred, he would probably have been met by the objection that his protest was untimely.

The Administrator speaks of the brokerage allowance as a "service charge" which a consumer mill is permitted to pay for specifically defined services rendered to it in connection with its purchase of wastepaper. This seems to us to be somewhat of a misnomer. The service is said to be the securing of a sufficient supply of wastepaper for the paper mill at the time and in the grade and form needed and the guaranteeing of the paper's merchantable quality. But, as illustrative of the operation of the brokerage provision, take the case of a broker-dealer who receives an order from a mill for a carload of wastepaper of a certain grade and quantity: He may fill this order in part from wastepaper which he had bought from a prior vendor already segregated and packed, and in part from paper which he had segregated and packed himself in his own packing plant. For the latter he may charge the mill only the ceiling price; for the former he may charge the mill the full ceiling price plus the brokerage allowance. His warranty covers both the paper which he packed himself and the paper which he bought already packed. In either case, from the point of view of the consuming mill, his "service" is no different from that of any vendor in securing goods for his customer. In either case, what the mill buys from him is the same, but, curiously enough, he gets less for the wastepaper upon which he himself has performed the necessary processing than for the paper he has acquired already packed from a prior vendor.[2] During part of 1942, when supplies of wastepaper were plentiful and mills could obtain their needs by paying less than the legal ceiling price, the mills stopped paying this so-called brokerage allowance; as was the case prior to price control, the mills would pay their vendors the same price for a given quantity and grade of wastepaper regardless of whether the vendors had themselves packed the paper or had acquired the paper from a prior vendor already packed for direct mill consumption. This reinforces the complainant's contention that the brokerage allowance is not in any proper sense a "service charge," but that the brokerage provision in fact establishes two sets of ceiling prices for sales of the same commodity at the same distribution level.

But the fixing of price differentials for the same commodity is not necessarily beyond the power of the Administrator. There is no doubt that the Admin-

---

[2] The Administrator has an explanation for this surface anomaly. The imposition of price ceilings under the terms of the price schedule as originally issued did not threaten the extinction of the dealer function. Paper mills were in the market only for wastepaper already sorted and baled in the appropriate grades; hence there was no threat that the paper mills would bypass a dealer and raid his sources of supply of unsegregated wastepaper. Persons having unsegregated wastepaper to sell therefore could not expect to obtain a price therefor equal to that being paid by the paper mills for sorted and baled wastepaper, and the dealer who performed this necessary processing operation before resale to a mill continued to have his margin of profit. It was only the broker function which was threatened with extinction, as has already been explained in the body of this opinion. The brokerage provision was designed to restore the margin of profit for the broker's operation.

istrator had power to extend price control to the wastepaper industry, for he had every *reason* to anticipate that unless subjected to control the prices of wastepaper would rise to an extent inconsistent with the purposes of the Act. This being so, he had power to insert in the regulation provisions reasonably designed to make it workable, with a minimum disruption of the normal channels of distribution. Among the declared purposes of the Act are to eliminate "disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency" and "to assist in securing adequate production of commodities." It is expressly provided in § 2(c) of the Act that price regulations "may be established in such form and manner, may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act." This broad grant of power was ample to justify the Administrator in dealing with the dislocation of the normal channels of distribution in the wastepaper industry which became manifest shortly after the imposition of price control by the original price schedule.

But as we understand the record, the challenged brokerage provision has gone beyond the necessities of the situation which it was designed to correct and has introduced a new and unnecessary competitive disadvantage to the prejudice of complainant's type of operation. The Administrator's brief, in describing the disruptive situation that became manifest shortly after the issuance of the original price schedule, states that "some mills were able to augment their supply of wastepaper by offering full ceiling prices to the junk shops and other primary sources of supply whose wastepaper would normally have been routed through brokers or dealers to competing mills." As the complainant points out, a junk shop is not a primary source of supply. The various places where paper first becomes wastepaper, such as homes, stores, offices and business establishments of all sorts, are the primary sources of supply of wastepaper. The peddler, and above him the junk shop, are middlemen in the channels of distribution from the primary sources of supply to the consuming mills. There is evidence in the record that after the issuance of the original price schedule some paper mills began to purchase sorted and baled wastepaper directly from the junk shops, bypassing the broker. However, we are unable to find in the record any evidence that mills were purchasing directly from industrial producers, such as Flett's clients, or other primary sources of supply. So far as appears, brokers who prior to price control were in a position to compete with Flett on an equal basis, and no better than equal basis, for the marketing of the supply of wastepaper sorted and baled by the industrial accumulator, were not adversely affected in such competitive operation as a result of the issuance of the original price schedule. From the point of view of the consuming mills Flett performs a function quite as useful as that of brokers in seeking out sources of wastepaper and moving the same along to the mills. True, Flett does not give the mills his personal warranty, as does the broker; but even if Flett did so, he would not, under the terms of the brokerage provision, be entitled to the so-called brokerage allowance because of the purely formal circumstance that title to the wastepaper does not pass through Flett as it does through the broker. This, however, is of no consequence to the consuming mills.

The brokerage provision subjects Flett's type of operation to a competitive handicap in favor of brokers which was not characteristic of the industry prior to price control and which, so far as this record discloses, is wholly unnecessary for the effectuation of the purposes of the Act. We therefore conclude that the brokerage provision in its present terms must be deemed arbitrary and discriminatory, and not in accordance with law, and that it must be set aside by this court.

Under § 204(b) of the Act our decree setting aside the brokerage provision at the earliest cannot take effect until the expiration of 30 days from the entry thereof. Meanwhile the Administrator will have an opportunity, if he is so advised, to amend the provision in some way not inconsistent with this opinion. The form which such an amendment would take is of course a matter confided primarily to the expert judgment of the Price Administrator. Our function is confined to setting aside in whole or in part a regulation

found by us to be not in accordance with law. We cannot modify or revise its terms.

A decree will be entered setting aside subsection (g) of § 1347.14, Appendix A, of Maximum Price Regulation No. 30.