196 F.2d 521
 DAVIDSON MEAT CO., Inc., et al.
v.
ARNALL, Director of Price Stabilization.
 No. 592.
 United States Emergency Court of Appeals.
 Heard at Chicago April 19, 1952.
 Decided May 14, 1952.
 
 Louis R. Simpson, Chicago, Ill., for the complainants.
 Katherine H. Johnson, Atty., Department of Justice, Washington, D. C., with whom Holmes Baldridge, Asst. Atty. Gen., Edward H. Hickey, Chief, General Litigation Section, and George Arthur Fruit, Atty., all of the Department of Justice, and James A. Durham, Asst. Chief Counsel, and Fred J. Melaugh, Jr., and Morris H. Kaufman, Attys., all of the Office of Price Stabilization, Washington, D. C., were on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.
 MAGRUDER, Judge.
 
 
 1
 Complainants assert that they are aggrieved by an order issued by the Director of Price Stabilization on December 19, 1951, denying their consolidated protests against certain provisions of Ceiling Price Regulation 24 — Ceiling Prices of Beef Sold at Wholesale, 16 F.R. 3721, issued under the Defense Production Act of 1950, 64 Stat. 798, 50 U.S.C.A.Appendix, § 2061 et seq. Joined as complainants are Davidson Meat Co., Inc., of Chicago and Los Angeles, Gotham Hotel Supply Company, Inc., of New York, Williams Meat Co., Inc., of Kansas City, Kansas, Jepsen Hotel Supply Company, of Washington, D. C., and Ed Heuck Co., of San Francisco, all wholly owned subsidiaries of Wilson & Co., Inc., a large cattle slaughterer and meat packer. Each complainant operates one or more separate establishments known in the industry as a "hotel supply house", though none of them comes within the category of a hotel supply house as specially defined in the regulation. The cases of the first four complainants raise the same point and will be discussed collectively. The complaint of Ed Heuck Co. raises a somewhat different, though not unrelated, point which will be discussed separately in the latter part of this opinion.
 
 
 2
 Hotel supply houses are wholesalers of meat and related products which supply hotels, restaurants and other purveyors of meals, in addition to making sales in normal wholesale channels. Historically their operation has been to purchase primal cuts of beef and other meats from slaughterers and packers, or sometimes from wholesalers (at somewhat higher prices), and to fabricate these cuts to meet the special requirements of their customers in the hotel and restaurant trade, delivering to such customers, as needed, aged and trimmed steaks, roasts, stews, ground meats, etc., in a condition ready to be cooked and served. The specialized function performed by hotel supply houses is recognized as differing substantially from that performed by the ordinary wholesalers of meat. It entails frequent consultation with chefs, cooks and stewards, the aging and holding of meat in refrigerated storage, frequent and irregular deliveries often of small quantities, and the granting of credit terms more liberal than those generally offered by other wholesalers. As a consequence, prices charged by hotel supply houses for the sale of such fabricated cuts to purveyors of meals have historically been somewhat higher than the general level of wholesale prices for unfabricated cuts. This historical differentiation was recognized and preserved by Revised Maximum Price Regulation No. 169 issued by the Price Administrator under authority of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq. Our decision in Oswald & Hess Co. v. Bowles, Em.App.1945, 148 F.2d 543, dealt with the provisions of RMPR 169 applicable to hotel supply houses.
 
 
 3
 In issuing CPR 24, respondent also took cognizance of the difference between the ordinary meat wholesaler and the hotel supply business. Section 20 of CPR 24 establishes a schedule of basic maximum prices, applicable to slaughterers, for sales of beef carcasses and certain defined wholesale cuts of beef. To these prices ordinary wholesalers, as defined, are permitted by § 42 to add $2.25 per cwt. on sales to retailers or purveyors of meals. Section 21 establishes several schedules of ceiling prices for certain defined fabricated cuts sold by various sellers to different classes of customers. The highest level of ceiling prices for fabricated cuts is set forth in schedule II(a) as applicable to sales by hotel supply houses or ship suppliers to purveyors of meals. The next lower level of ceiling prices is set forth in schedule II(b) applicable to sales of fabricated cuts by combination distributors to purveyors of meals. A still lower level of ceiling prices is established in schedule II(c) for sales of such fabricated beef cuts by all other sellers to purveyors of meals. In the sale of such fabricated cuts to purveyors of meals, a hotel supply house, as defined, is allowed roughly a 3 per cent higher markup over the prices of the primal cuts established in § 20 than is allowed to a so-called combination distributor, and a 6 per cent higher markup than is allowed under schedule II(c) to slaughtering establishments and ordinary wholesalers.
 
 
 4
 Relevant terms are defined in § 50 of CPR 24 as follows:
 
 
 5
 "(k) [As amended by Amendment 2, 16 F.R. 4444] Hotel supply house means any establishment
 
 
 6
 "(1) Which sold or delivered to purveyors of meals during 1950 not less than 70 percent of the total volume by weight of all meats, including sausage, variety meats and edible by-products, sold or delivered by it, excluding sales to defense procurement agencies, and
 
 
 7
 "(2) Which is not affiliated with a packing or slaughtering plant, packer's branch house, wholesaler's or other non-retail meat selling establishment."
 
 
 8
 "(g) [In its present form, see 16 F.R. 11821] Combination distributor means any establishment (1) Which is not affiliated with a packing or slaughtering plant, packer's branch house, wholesaler's or other non-retail meat selling establishment, and which sold or delivered to purveyors of meals during 1950 not less than 25 percent of the total volume by weight of all meats, including sausage, variety meats and edible by-products, sold or delivered by it, excluding sales to defense procurement agencies; or
 
 
 9
 "(2) Which is not affiliated with a packing or slaughtering plant, packer's branch house, wholesaler's or other non-retail meat selling establishment to which it is physically attached; and, which sold or delivered to purveyors of meals during 1950 not less than 25 percent of the total volume by weight of all meats including sausage, variety meats and edible by-products, sold or delivered by it, excluding sales to defense procurement agencies."[1]
 
 
 10
 "(u) Wholesaler means a person (other than a hotel supply house, combination distributor, peddler truck seller)
 
 
 11
 "(1) Who buys beef for resale; and
 
 
 12
 "(2) Who is not affiliated with any slaughtering plant or facilities, engaged in the slaughtering of cattle; and * * *."
 
 
 13
 "(a) Affiliated means the relationship existing between two persons when one is owned or controlled by the other, or both are owned or controlled by the same person * * *. Own or control means to own or control directly or indirectly a partnership equity or in excess of 10 percent of any class of outstanding stock, or to have made loans or advances in excess of 5 percent of the other person's monthly sales."
 
 
 14
 During 1950 the volume of sales to purveyors of meals, computed in accordance with § 50(k)(1), made by the establishments operated by complainants Davidson, Gotham, Williams, and Jepsen, was in excess of 70 per cent of their respective total sales. These four complainants would, therefore, be classified as hotel supply houses, and would be entitled to charge, for the sale of fabricated cuts to purveyors of meals, in accordance with the highest schedule of prices set out in § 21, except for the disqualifying fact, as provided in § 50(k)(2), that all of their respective capital stock is owned by Wilson & Co. Solely because of this affiliation, they are classified rather as combination distributors; consequently the maximum prices they may charge for sales of fabricated cuts to purveyors of meals are somewhat lower than those which hotel supply houses, as defined, are permitted to charge.
 
 
 15
 Complainants do not allege that affiliated hotel supply houses like themselves cannot operate profitably under the ceilings imposed. Rather, their objection is that they are held to a lower level of ceiling prices than those allowed to independent hotel supply houses with which, historically, they have competed on an equal basis on the same level of distribution; that this differentiation serves none of the purposes of the Act and therefore constitutes an unwarranted and unlawful discrimination.
 
 
 16
 The principle invoked by complainants was expressed by us in Earl C. Gibbs, Inc. v. Defense Supplies Corp., Em.App.1946, 155 F.2d 525, 531, as follows: "If a price regulation prescribed a maximum price for a commodity as applicable generally to a particular class of sellers, and then without any rational basis of differentiation prescribed a lower maximum price as applicable to an individual member or small group of that class, the latter provision would constitute an arbitrary and capricious discrimination." In many cases, applying this principle to regulations issued under the Emergency Price Control Act, we invalidated pricing provisions which we deemed to involve an arbitrary and unjustified discrimination between sellers similarly situated. See, e. g., Flett v. Bowles, Em.App.1944, 142 F.2d 559; Hawaii Brewing Corp., Ltd. v. Bowles, Em. App.1945, 148 F.2d 846; Booth Fisheries Corp. v. Bowles, Em.App.1946, 153 F.2d 449; G. R. Kinney Co., Inc. v. Porter, Em. App.1946, 157 F.2d 683. On its facts, the Booth Fisheries case is closely analogous, and we think our decision there supports the contention of the present complainants. In that case we invalidated provisions of MPR 579 which allowed higher ceiling prices to independent inland wholesalers who procured their frozen fish from a primary distributor or from an inland warehouse of a processor than the ceiling prices allowed to Booth Fisheries Corporation's inland wholesale branches, though such branches functioned in exactly the same way as an independent inland wholesaler and procured their frozen fish in identical fashion.
 
 
 17
 In justification of the imposed differential here, respondent's statement of considerations makes no assertion that there was an historic pattern in the industry under which affiliated hotel supply houses like complainants characteristically sold fabricated cuts to purveyors of meals at lower price levels than the prices charged to purveyors of meals for corresponding cuts by independent hotel supply houses. Upon the contrary, the complaint in the present case alleges, and the allegation is not denied in respondent's answer, that historically "the prices for fabricated beef cuts sold to purveyors of meals by each complainant have approximated the same general level of prices charged by competing non-affiliated hotel supply houses for the same products to the same class of customers. Such prices have always been determined on the basis of competition, with service and quality considerations always of vital importance. At no time has any price differential or price distinction ever been recognized or practiced by any complainant herein merely because its capital stock happened to be owned by Wilson & Co., Inc." The challenged provision of CPR 24 cannot, therefore, be justified as merely preserving a price differential between two categories of sellers characteristic of the industry prior to the imposition of controls. We made a similar comment in the Booth Fisheries case, supra, pointing out, 153 F.2d at page 451, that the Price Administrator had not suggested "that the complainant's inland wholesale branches historically charged lower prices than the independent inland wholesalers with which they were in competition."
 
 
 18
 Respondent has undertaken to deduce from certain quite fragmentary exhibits in the record that affiliated hotel supply houses have not historically enjoyed as high markups over costs as have independent hotel supply houses. Exhibit K, covering only a single 12-month period, from July, 1949, to June, 1950, gives figures taken from the profit and loss statements of 77 independent hotel supply houses, indicating a difference between cost and sales value of meat sold by this group in the sum of $17,025,169, or an average percentage markup for the group of 17.4. The accompanying affidavit by respondent's economist concedes, however, that independent hotel supply houses generally "had no truly adequate price data for any past period including the pre-Korean period", and that "few, if any, of these sellers had markup data covering beef sales alone." Furthermore, it appears from an analysis attached as an appendix to complainants' brief that, even for this one 12-month period, the percentage markups varied greatly within the group of 77 independents, 15 per cent of them having markups under 12 per cent.
 
 
 19
 To compare with this average percentage markup of 17.4 for the year July 1949-June 1950, respondent has no comparable figures for affiliated hotel supply houses generally. He refers only to data submitted by the Wilson affiliates, complainants herein, which he assumes to be representative of affiliated hotel supply houses generally. Exhibits A and B indicate the average percentage markups for Wilson affiliates combined to have been 10.7 per cent for the fiscal year ending October 31, 1949, and 13.1 per cent for the fiscal year ending October 31, 1950. These two exhibits in fact give percentage markups for Wilson affiliates from 1940 through May, 1951. The figures show considerable variation in percentage markups from year to year; for instance, for the years 1945 and 1946 the percentage markups for Wilson affiliates combined considerably exceeded the figure of 17.4 per cent given as the average markup for the 77 independent hotel supply houses for the year July 1949-June 1950.
 
 
 20
 The data we have summarized is wholly insufficient to justify an inference that affiliated hotel supply houses have not historically enjoyed as high markups as have independent hotel supply houses. Furthermore, markup data would seem to be irrelevant to the present inquiry, since we must take it, on this record, that there has been no historical differential in the general level of prices charged by the affiliates and the independents competing at the same level of distribution. It is wholly a matter of speculation what factors may have accounted for the wide variation in markup percentages among the 77 independents for the year July 1949-June 1950, and for the wide variation in markup percentages between the various Wilson affiliates for the years 1940 through May, 1951.
 
 
 21
 The only other substantial contention advanced by respondent in support of the discriminatory treatment is that the challenged differential is necessary in order to avoid disruption of normal patterns of distribution and to assure to independent hotel supply houses a fair opportunity to compete with affiliates in periods of short supply. The a priori reasoning is that when meat supplies tighten the affiliates are in an advantageous position in that there would be a tendency for their affiliated slaughterer to favor them with a sufficient supply of primal cuts at the lower prices applicable to sales by slaughterers, while the independents would be forced to buy relatively larger amounts of beef from wholesalers at higher prices.
 
 
 22
 We fail to see how the differential would serve to counteract this tendency. Respondent disavows any intention to put the affiliated hotel supply houses out of business; and in the absence of any contention by complainants to the contrary, we must assume that the present ceilings are sufficient to enable the affiliates to operate profitably. Therefore the parent slaughterers still have a pecuniary incentive for augmenting the hotel supply business of their own affiliates. The regulation imposes no quota upon the amount of beef which the slaughterers may channel to their affiliates, nor does it impose any quota upon the amount of fabricated cuts which the affiliates may sell to purveyors of meals. It would seem, then, that the present differential would merely require the affiliates to undersell the independents, competing at the same level of distribution for the trade of purveyors of meals, unless such independents, to meet the competition, reduce their prices below the levels permitted to them by the regulation. It is not apparent how the differential in question would tend to keep the independents in business. Respondent does not claim that such differential was inserted in the regulation in response to representations by the independents that otherwise they would be forced out of business.
 
 
 23
 It is not without significance that the Price Administrator, in dealing with this problem under the Emergency Price Control Act, did not deem it necessary to establish any such price differential as between affiliated and independent hotel supply houses making sales of fabricated cuts to purveyors of meals. Under Amendment 12 to RMPR 169, a hotel supply house was defined as "a separate selling establishment which is not physically attached to a packing or slaughtering plant, packer's branch house, wholesaler's or other selling establishment; which is engaged in the fabrication of meat cuts and in the sale of fabricated meat cuts, variety meats and edible by-products to purveyors of meals; and which during the period September 15 through December 15, 1942 sold to purveyors of meals, other than war procurement agencies, 70 percent of the total weight volume of meat, variety meats, or edible by-products sold by it." (8 F.R. 7110) See the discussion in Oswald & Hess Co. v. Bowles, Em.App.1945, 148 F.2d 543. In other words, under RMPR 169 an establishment otherwise qualifying as a hotel supply house came within that category whether or not it was affiliated with a slaughterer. In order to prevent affiliated hotel supply houses from getting a competitive advantage from such affiliation as against independents in a period of short supply, the regulation further imposed certain quota restrictions limiting the amount of fabricated cuts which each seller could sell to purveyors of meals.
 
 
 24
 We further think the unreasonableness of the challenged differential in CPR 24 is apparent from the face of the regulation, by reference to two of its other provisions dealing with related problems:
 
 
 25
 First, as stated above, schedule II(b) in § 21 establishes ceiling prices applicable to sales of fabricated cuts by so-called combination distributors to purveyors of meals. No distinction is drawn here between a combination distributor affiliated with a slaughterer and an independent distributor. Thus suppose there were two establishments each of which during 1950 sold to purveyors of meals only 69 per cent of its total volume of meats. One of these establishments might be affiliated with a slaughterer, with whatever advantage in the procurement of supplies that might entail, and the other not; and yet both establishments would fall within the category of "combination distributor", as defined, and be accorded the same level of ceiling prices for sales of fabricated cuts to purveyors of meals under schedule II(b).
 
 
 26
 Second, a "wholesaler" as defined in § 50(u) means a person (other than a hotel supply house, combination distributor, or peddler truck seller) who (1) buys beef for resale; and (2) is not affiliated with any slaughtering plant or facilities, engaged in the slaughtering of cattle. Such wholesalers are permitted by § 42 to add to the basic maximum prices for primal cuts and boneless beef cuts set forth in §§ 20 and 22 the sum of $2.25 per cwt. on sales to retailers or purveyors of meals. Amendment 3 (16 F.R. 6378) added to § 42 a provision reading: "If you do not qualify as a wholesaler, only by reason of the fact that you do not meet the requirements of section 50(u)(2) of this regulation [that is, because of affiliation with a slaughterer], you may add the appropriate wholesaler's addition on sales of those beef products you buy for resale from unaffiliated sources". We quote in the footnote the Director's comment in the accompanying statement of considerations, explaining the reason for this change.[2] This treatment of affiliated wholesalers is to be contrasted with the treatment accorded the present complainants. Exhibit E shows that the Wilson affiliates combined since 1947 have purchased considerably more than half their beef from packers and wholesalers other than Wilson & Co., in strict competition with the independent hotel supply houses. The figures in Exhibit F show that complainant Gotham during the same years purchased only a very minor part of its beef supplies from its affiliate Wilson & Co. — for 1951 only 3 per cent. Yet under the regulation as written these complainants, even with respect to the greater portion of their beef supplies procured from outside sources in competition with the independents and made by them into fabricated cuts, are required to sell such fabricated cuts to purveyors of meals at a lower level of ceiling prices than those permitted to their competitors.
 
 
 27
 We come finally to the separate complaint by Ed Heuck Co. This complainant in 1950 sold to purveyors of meals slightly less than 70 per cent of its total volume of meats. It therefore did not qualify as a hotel supply house, as defined, even apart from its affiliation with the slaughterer Wilson & Co. Heuck does not challenge the reasonableness of the line drawn at 70 per cent in the definition of hotel supply house; and it does not claim that it should be allowed to charge the same prices for the sale of fabricated cuts to purveyors of meals as are permitted to establishments falling within the hotel supply house category. Because its establishment is not physically attached to a slaughtering plant and because during 1950 it made more than 25 per cent of its sales of meat to purveyors of meals, Heuck is classified under the regulation as a combination distributor.
 
 
 28
 In CPR 24 as originally issued, § 20, establishing basic ceiling prices for beef carcasses and wholesale cuts, and § 22, establishing basic ceiling prices for boneless beef cuts, each contained a special adjustment provision reading: "If you are a combination distributor, you may add $2.00 per cwt. to the prices listed above." Originally, therefore, Heuck was entitled to this $2.00 markup on the basic prices listed in §§ 20 and 22 when performing the essentially wholesaler's function, selling primal beef cuts and boneless beef cuts to retailers, as well as to purveyors of meals. However, by Amendment 3 to CPR 24 (16 F.R. 6378), the special adjustment provisions to §§ 20 and 22 were amended to read as follows: "If you are a combination distributor not affiliated with a slaughterer you may add $2.00 per cwt. to the prices listed above, and if you are a combination distributor affiliated with a slaughterer you may add $2.00 per cwt. to the prices listed above on sales to purveyors of meals only." The effect of the amendment is that unaffiliated combination distributors may add $2.00 per cwt. to the ceiling prices set forth in §§ 20 and 22 on sales to all buyers, including retailers, whereas combination distributors affiliated with a slaughterer are permitted to make this $2.00 per cwt. addition only on sales of these commodities to purveyors of meals. Heuck's separate establishment, in performing a wholesaler's function in selling primal beef cuts and boneless beef cuts to retailers, in strict competition with independent combination distributors at the same level of distribution, is thus held to a lower level of ceiling prices than those allowed to its competitors. The differential turns solely on the fact that Heuck's capital stock is owned by Wilson & Co. For the same reasons explained in the earlier part of this opinion, the differential founded on this fact alone does not further any of the purposes of the Act and must be deemed to be an arbitrary discrimination.
 
 
 29
 A judgment will be entered setting aside § 50(k)(2) of Ceiling Price Regulation 24 as amended; and further setting aside paragraph (4) under the heading "Special Adjustments" in § 20 as amended, and paragraph (2) under the heading "Special Additions" in § 22 as amended, in so far as those two paragraphs impose upon combination distributors affiliated with a slaughterer lower ceiling prices than are imposed upon other combination distributors.
 
 
 
 Notes:
 
 
 [1]
 The definition of "combination distributor", as amended, is awkward in phraseology. However, we understand its effect to be that an establishment which during 1950 sold to purveyors of meals not less than 25 per cent of its total volume of all meats, may be classified as a combination distributor, even though it is affiliated with a slaughtering plant, provided it is not "physically attached" thereto
 
 
 [2]
 "The definition of wholesaler in the regulation excluded those affiliated with slaughtering plants. It has come to the attention of the Director of Price Stabilization that this denial of the wholesaler's addition to all slaughterer affiliates has caused considerable hardship and threatens the existence of many customary wholesaler operations. The fact of affiliation alone does not necessarily produce economies and differences in methods of operation sufficient to justify the denial of a wholesaler's margin. A more significant basis for determining the need for a wholesaler's mark-up is the source of supply from which the affiliated operator obtains his beef. For example, if a person sells only non-kosher products purchased from others, it seems reasonable that he should be classified as a wholesaler even though he is affiliated with a slaughterer handling only kosher products. Although in this and other cases, an affiliated wholesaler may have customarily procured a substantial part of his meat from sources other than the slaughtering affiliate, CPR 24 as originally issued prevented him from securing any portion of the wholesaler's addition
 "After careful consideration of the problem, the Director finds that those persons who customarily purchased a substantial percentage of their total supplies for resale from independent non-affiliated sources should be entitled to receive the wholesaler's addition on the supplies customarily and currently received from independent sources. This amendment therefore grants to those businesses, which could not qualify as wholesalers solely because of affiliation with slaughtering plants, an addition on their purchases of beef for resale from independent sources." (16 F.R. 6376)