202 F.2d 161
 JAMES FLETT ORGANIZATION, Inc.
v.
FREEHILL, Director of Price Stabilization.
 No. 620.
 United States Emergency Court of Appeals.
 Heard at Chicago January 19, 1953.
 Decided February 17, 1953.
 
 George W. K. Snyder, Chicago, Ill., Laurens G. Hastings and David P. List, Chicago, Ill., on the brief, for complainant.
 Israel Convisser, Assistant Chief Counsel, Brooklyn, N. Y., Herbert N. Maletz, Chief Counsel, James A. Durham, Associate Chief Counsel, Joseph T. Maioriello, Office of Price Stabilization, Holmes Baldridge, Asst. Atty. Gen., Edward H. Hickey, Chief, General Litigation Section and George Arthur Fruit, Department of Justice, Washington, D. C., on the brief, for respondent.
 Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.
 LINDLEY, Judge.
 
 
 1
 This complaint under Section 408(a) of the Defense Production Act of 1950, as amended, 50 U.S.C.A.Appendix, § 2108(a) challenges the validity of the so-called "Brokerage Commission" of Section 19, Ceiling Price Regulation 5 — Iron and Steel Scrap, which permits consumers of such scrap to pay a sum of $1 in addition to the prescribed maximum prices to sellers of such scrap denominated "brokers" who have complied with the several eligibility provisions of the regulation.
 
 
 2
 Complainant avers that it has historically engaged in the ferrous scrap business in competition with those classified as "brokers"; that it has been denied the $1 markup given its competitors by Section 19 of CPR 5; that the basis of this denial is an arbitrary, capricious and unreasonable classification, founded upon neither historical price differences nor upon necessity to effectuate the purposes of the Act. In short, complainant asks us to invoke the principle stated in Hawaii Brewing Corp. v. Bowles, Em.App., 1945, 148 F.2d 846, 850: "It is essential to fair treatment that all persons who are similarly situated be dealt with upon an equal basis; that no greater burdens be laid upon one than are laid upon others in the same calling and condition." To the same effect are: Davidson Meat Co., Inc. v. Arnall, Em.App., 1952, 196 F.2d 521; Booth Fisheries Corp. v. Bowles, Em.App., 1946, 153 F.2d 449; Flett v. Bowles, Em.App., 1944, 142 F.2d 559.
 
 
 3
 Briefly, the facts from which this litigation stems are as follow: Approximately fifty percent of the total raw materials used in the manufacture of steel is ferrous scrap, which results whenever iron or steel is worked in any way, e. g., tooled, trimmed, stamped, melted or rolled. It also comes from outworn discarded implements such as junked automobiles, farm equipment, toys, and other ferrous products It is produced at one of three main sources: (1) industrial plants, from tooling, stamping and rolling either iron or steel, and also from outworn industrial equipment; (2) railroads, from discarded rails, wheels and other equipment; (3) miscellaneous sources, such as homes, farms and demolition projects, where it comes largely from discarded equipment.
 
 
 4
 The economic purpose of the industry is to collect, accumulate, sort and grade this material and see to it that it is delivered to the consumers, who are, in the main, the steel mills. It hardly need be stated that it is not economically feasible for all producers to sort, grade and deliver their product individually to the consuming mill. Consequently, a hierarchy of collection, accumulation and distribution agencies has developed.
 
 
 5
 Peddlers are the most numerous; some 100,000 perform the scavenger function. They collect scrap from miscellaneous sources, segregate and sort it (but, as a rule do not grade it), and sell it to those immediately above them in the industrial set-up, the dealers. Small dealers, numbering an estimated 10,000, purchase scrap from peddlers and industrial producers, and then sort, segregate and grade it, making it ready for consumption. They sell to large dealers, brokers and consumers; mostly, it seems, to the larger dealers. The latter totalling 2,000 acquire the product from peddlers, industrial producers and small dealers, segregating and grading it so that it is ready for consumption, and sell to brokers and consumers. Brokers, approximately 400 strong, are usually also large dealers. However, the brokerage function is recognized in the industry as a separate level in distribution and collection. The broker buys carload and lessthan-carload lots of sorted and graded scrap from industrial producers and dealers, combines them into carload lots and sells to consumers.
 
 
 6
 Three-fourths of all scrap eventually purchased by consumers passes through one or more of these four levels of distribution. Of the remaining one-fourth, seventy-five percent is sold by the producer to the broker and by the latter to the consumer. The remaining twenty-five percent, or 6¼% of the total supply, is sold by the producer directly to the consumer.
 
 
 7
 Of equal importance is the arrangement of scrap into segregated, sorted, consumable grades. The peddler collects scrap of all types: paper, ferrous metals, non-ferrous metals and textiles. The first step in preparation for consumption usually performed by him is the segregation of the mass into these four recognizable classes. Thereafter the ferrous scrap must be further prepared by grading it as to quality; reducing large pieces in size by cutting; accumulating small pieces into consumable bundles by baling and compression. This last work necessitates no inconsiderable investment in special equipment. Consequently, it is generally performed only by dealers and self-preparing producers. It is never performed by the broker, unless he has combined his brokerage business with that of a dealer, for, as previously stated, the broker's function is limited to buying and selling scrap in sorted and graded form.
 
 
 8
 Certain large producers, automobile manufacturers, have historically prepared their own scrap and sold it either directly to the consumer or to a broker. Apparently the large volume of scrap resulting from the manufacturing process of such industrial concerns was readily recognized as a source of revenue which could be increased by self-preparation. But other manufacturing concerns of lesser size were not so quick to acquaint themselves with these economic benefits. It is here that complainant functions in the industry.
 
 
 9
 Beginning in 1934 complainant undertook an educational program aimed at the smaller producers who had not engaged in their own preparation of the material. Briefly, complainant approaches a manufacturing producer and surveys its salvage scrap. It makes suggestions concerning segregation and grading and correlates the operation to the overall economics of the industry. It is complainant's purpose to convince the producers that greater profit can be realized if they adopt total or limited preparation. Complainant then sells these services to the producer: (1) A preparation program designed to meet the individual needs of the producer, put into operation under the direction of complainant's trained personnel. Ultimately these employees of complainant leave the premises of the producer, the preparation then being continued by the latter's employees. (2) Occasional service calls are made to see that the program is functioning efficiently. (3) Complainant acts as selling agent for the producer, agreeing to obtain the highest market price quoted in a representative trade journal for the particular grade of scrap sold. In return complainant is made the exclusive selling agent of its client, and paid a commission of five percent of the net selling price. Should complainant fail to obtain the highest quoted prices, its client may cancel the agreement.
 
 
 10
 Ceiling Price Regulation 5 — Iron and Steel Scrap, imposes maximum prices on the sale of prepared and unprepared ferrous scrap. Section 19 thereof provides as follows:
 
 
 11
 "Commissions. (a) No commission shall be payable on sales made under this regulation except by a consumer to a broker for brokerage services rendered to the consumer. * * * In the event that a broker purchases iron or steel scrap for sale to a consumer, such consumer may pay such broker a commission not exceeding $1.00 per gross ton. No commission shall be payable unless
 
 
 12
 "(1) The broker is regularly and primarily engaged in the business of buying for and selling scrap to, a consumer;
 
 
 13
 "(2) The broker guarantees the quality and delivery of an agreed tonnage of scrap;
 
 
 14
 "(3) The scrap is purchased by the consumer at a price no higher than the ceiling prices established in this regulation;
 
 
 15
 "(4) The broker sells the scrap to the consumer at the same price, with the same discounts and allowances, at which he purchased it, * * *;
 
 
 16
 "(5) * * *
 
 
 17
 "(6) The commission is shown as a separate item on the invoice.
 
 
 18
 "(b) No commission shall be payable to a person for scrap which he prepared: * * *
 
 
 19
 "(c) No commission shall be payable to a person controlling, or holding directly or indirectly a substantial financial interest in the person preparing the scrap, or to a person employed or controlled by the person preparing the scrap, or to a person in whom the person, preparing the scrap holds directly or indirectly a substantial interest or control: * * *."
 
 
 20
 Complainant does not qualify for this broker's commission, for it does not take title to the scrap it sells, and is not retained by the consumer, but, rather, by the producer. It asserts that the foregoing provisions place it at a competitive disadvantage in sales for its principals, directly to consumers, and create a corresponding competitive advantage for brokers on purchases from producers for resale to consumers, which was not characteristic of the industry prior to price control. This has resulted from the following facts.
 
 
 21
 Historically the broker purchased scrap from self-preparing producers at prices as low as possible and resold it at the highest price obtainable from the consumers. His profit was derived from the difference between his buying and selling prices, whereas complainant realized its profit from the five percent commission it received from its principal. During a period of short supply the self-preparing producer will seek out means of disposing of his scrap which yields the best return. Historically complainant and the broker offered approximately the same revenue to the producer. But under CPR 5 the broker has acquired a favored position.
 
 
 22
 Assume that prior to the promulgation of the regulation ferrous scrap, prepared for consumption, was selling at $20 per ton. A producer, upon realizing this price on a sale through complainant, would net $19 per ton ($20 less 5% of $20). The broker would likewise sell at $20 per ton. In order to realize a profit he would necessarily purchase at a price lower than that, presumably in the vicinity of $19 per ton. Thus, the producer would realize substantially the same return dealing with either complainant or the broker. However, upon issuance of CPR 5, this competitive position was altered. Assume now that the ceiling price for ferrous scrap is $20 per ton. Again complainant sells at that price and realizes for its principal a net of $19. The broker, on the other hand, may now pay the producer $20 per ton, and, upon resale at the same price, receive $1 per ton commission. In a period of short supply the consumer is willing to pay this additional amount to the broker. But, by reason of this regulatory commission, the broker has climbed to a superior position, which he did not enjoy prior to price control. As a result, the producer will, quite naturally, deal through the broker from whom he can receive $20 per ton, rather than complainant who will get for him a net of $19.
 
 
 23
 Thus far complainant's business has not suffered greatly. It has had a loss of two customers and a gain of two. However, we are not told whether these new clients are producers selling directly to consumers. It is this relatively limited segment of the industry with which we are now concerned. We think it is evident that if the present price differential is continued, the self-preparing producer will have no economic choice other than to deal only with the broker rather than complainant.
 
 
 24
 In Flett v. Bowles, Em.App., 1944, 142 F.2d 559, 565, this court considered, under the review provisions of the Emergency Price Control Act of 1942, 50 U.S. C.A.Appendix, § 901 et seq., MPR 30 covering wastepaper, the effect of which upon the wastepaper industry was identical with the impact of CPR 5 on the ferrous scrap industry. Indeed, complainant there was this complainant's predecessor, and its complaint pursued much the same lines as the present one. We held MPR 30 invalid insofar as "The brokerage provision" subjected complainant's "type of operation to a competitive handicap in favor of brokers which was not characteristic of the industry prior to price control and which", so far as the record disclosed, was "wholly unnecessary for the effectuation of the purposes of the Act." 142 F.2d at page 565. It is clear then that, unless we can distinguish the instant case from that existent in the prior litigation, the reasoning there followed should control here.
 
 
 25
 If brokers had historically received higher prices on their sales to consumers than had complainant, a reflection of this differential in CPR 5 would, of course, be lawful. It is respondent's position that such was the case. However, the evidence does not support the argument. The record contains data relative to complainant's sales to consumers during the years 1948-1950. Of 43 recorded transactions, complainant received more than minimum trade journal market prices on 15 occasions; less on 12; the same on 16. The record shows that these market quotations are indicative of the prices received by brokers on like transactions. Thus, it appears that, on the whole, complainant sold at the same price level as the broker. Consequently, we conclude that CPR 5 does not preserve a pre-existing price differential; rather it creates a new one.
 
 
 26
 Within this conclusion falls respondent's justification based on "services" performed by the broker, e. g., warranty of merchantability and procuration of an adequate amount of scrap at the time it is needed by the consumer. This contention was urged in support of the regulation in the prior Flett case. Here, as there, we feel that the term "service charge" is misleading. As previously noted many brokers also engage in the dealer operation. If a broker-dealer contracts to deliver two carloads of scrap and performs this contract by delivery of one carload he has prepared as a dealer, and a second purchased by him in prepared form, he is entitled to the commission on the second carload but not on the first. Yet his services are the same. He has warranted the scrap's merchantability and delivered both carloads when they were needed. Thus, we conclude, as we did before, that "the brokerage allowance is not in any proper sense a `service charge,' but that the brokerage provision in fact establishes two sets of ceiling prices for sales of the same commodity at the same distribution level." 142 F.2d at page 564.
 
 
 27
 But, says respondent, the differential is necessary to effectuate the purposes of the Act. He asserts, quite truly, that in a period of tight supply a vendor will, quite naturally, demand ceiling prices for his product. This the broker is financially unable to pay unless he, in turn, is given a markup from which to derive his profit. The result is that the broker's vendor holds back his scrap, making it necessary for the consumer to by-pass the broker and deal directly with his supplier. Thus, customary channels of distribution are disrupted. However, if the broker is able to pay his supplier the same price as could the consumer on a direct purchase from the supplier, this disruption will not occur.
 
 
 28
 While this may be sound justification for giving the broker a markup over cost, we fail to see how it supports the denial of that same price to complainant and its principals. No such disruptive effect as that described by respondent would result should complainant be placed on equal footing with the brokers with respect to sales to consumers. Normal channels of distribution would continue open. But, by denying this price to complainant, a danger is created that its means of distribution will be destroyed. The situation might, perhaps, arise where respondent would have to choose between two segments of the same industry; one to die, the other to survive. But such a case is not presented here. We can see no reason why complainant should not be extended the same ceiling price as that allowed brokers under Section 19 of CPR 5.
 
 
 29
 Respondent urges that, in view of the small amount of competition between complainant and the brokers, complainant should not be awarded the relief it seeks. During the years 1948-1950, only .4% of complainant's transactions were with consumers. While this is, admittedly, a small amount of competition, we think its slightness, standing alone, is no justification for destroying it.
 
 
 30
 Finally respondent contends that complainant has no standing to challenge the regulation. This is based on the assertion that complainant is not "subject to" CPR 5, and this, in turn, is premised on the ground that the regulation requires no affirmative or negative action on the part of complainant. Rather, says respondent, it is complainant's principal who is "subject to" the regulation. There is no doubt that complainant has shown an injury flowing from the regulation. In the words of the Supreme Court, it is "immediately, substantially and adversely affect[ed]". Parker v. Fleming, 329 U.S. 531, 536, 67 S.Ct. 463, 466, 91 L.Ed. 479. Such being true, it is entitled to have its grievance heard and determined by this court.
 
 
 31
 Judgment will enter setting aside Section 19 of Ceiling Price Regulation 5.